[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 23, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-15264

_____

D.C. Docket No. 99-03137-CV-C-E


LILLY M. LEDBETTER,

                                        Plaintiff-Appellee,

                    versus

GOODYEAR TIRE AND
RUBBER COMPANY, INC.,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
Northern District of Alabama

_____

**(August 23, 2005)**

Before TJOFLAT, DUBINA and PRYOR, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal involves a claim brought under Title VII of the Civil Rights Act of 1964[1] by a former salaried employee of Goodyear Tire and Rubber Co. ("Goodyear"). The employee, Lilly Ledbetter, claims that Goodyear paid her a smaller salary than it paid her male co-workers at Goodyear's Gadsden, Alabama, tire plant because of her sex. Goodyear's position, in addition to denying that sex played any role in the setting of her salary, is that Ledbetter may prevail only if she can prove that unlawful discrimination tainted an annual review of her salary made within 180 days of her filling a charge of discrimination with the EEOC. The question we must decide, therefore, is how Title VII's timely-filing requirement applies in this specie of disparate pay cases—that is, cases involving an employer that annually reviews and re-establishes employee salary levels.

We decline to adopt Goodyear's position definitively, because we need not do so to determine whether Goodyear is entitled to the judgment as a matter of law. All we need to do is examine the last salary decision Goodyear made that affected Ledbetter's pay during the limitations period. We have done that and conclude that no reasonable jury could find that the decision was discrimanitorily motivated. We therefore reverse the judgment of the district court denying Goodyear's motion for judgment as a matter of law.

---

[1] 42 U.S.C. §§ 2000e to 2000e-17 (as amended).

## I. Background and the Proceedings in the District Court

### A. Background

*1. The Gadsden Plant*

During the relevant time period, Goodyear's Gadsden plant was divided into several discrete units, called "business centers," each of which was responsible for one of the several stages of the tire production process. The plant included at least four business centers, each managed by a "Business Center Manager" ("BCM"): (1) Rubber Mixing (a.k.a. "Banbury" or the "Mixing Area"), where the rubber was prepared; (2) Component Preparation (a.k.a. "Stock Prep"), where the components for the tires were made; (3) Tire Assembly (a.k.a. the "Tire Room"), where machines were used to press the components into "green," or unfinished, tires; and (4) Curing/Final Finish, where the green tires were cured, painted, trimmed, and inspected before shipment.

These business centers were in some cases further divided into discrete "sections" or "rooms." Tire Assembly, for example, at one point included at least four sections, including the Radial Light Truck section ("RLT"), which assembled larger tires for sport-utility vehicles and light trucks, and the "ARF Room," which assembled smaller radial tires for passenger cars. Within any one section or room, there were normally three or four rotating shifts of floor-level workers and their

3

supervisors.

The machines used in the tire-production process were operated directly by "tire builders"—unionized, hourly workers. The tire builders were then supervised by salaried, nonunion, floor-level managers called "Area Managers." Each Area Manager supervised one shift of tire builders, such that if a section were running four shifts, it would have four Area Managers, one for each shift. These "production teams"—the tire builders and their Area Managers—were supported by unionized maintenance and electrical workers, as well as by various salaried managerial officers and specialists, including "Production Specialists" and "Production Auditors." Directly above the Area Managers in the corporate hierarchy were the BCMs, who were responsible for everyone in their business center, including the tire builders, the maintenance and electrical workers, the Area Managers, and the salaried managerial support staff. Supervision of the entire plant, including at least the four production-oriented business centers described above and a Human Resources Department, fell to a single Plant Manager.

*2. The Merit Compensation System*

Beginning in the early 1980s, managerial employees' salaries at the Gadsden plant were determined primarily based on a system of annual merit-based

raises. The exact details of the system do not warrant extended discussion.

Suffice it to say that in the early months of each year, each BCM was charged with

recommending[2] salary increases for the salaried employees under his or her

supervision, including the Area Managers. These recommendations were based

primarily on each employee's performance in relation to that of other salaried

employees in the business center during the previous year (the "performance

year"). Business-center-wide performance rankings were calculated based on

individual "performance appraisals" that had been completed for, and reviewed

with, each employee at the end of the performance year or early in the year

following. Using the performance rankings and certain Goodyear guidelines on

the size and frequency of merit-based raises, the BCM would complete a merit

increase plan, a worksheet detailing the merit increases the BCM recommended

for that year. These plans included, for each salaried employee, his or her

performance ranking, present salary, and salary range; the date of his or her last

increase; the recommended increase for the coming year (in dollars and as a

---

[2] The BCMs' recommendations were subject to the approval of higher management. The merit increase planning forms, for example, asked the BCM to state the increase he "proposed" for each employee. Indeed, two of the four planning forms admitted into evidence were signed and dated by individuals who served as Plant Manager, and a third was signed by an individual who served as Human Resources Manager. Goodyear's compensation guidelines for 1996 state that merit increases (for that year) had to be "approved by the head of the division prior to any increase being granted."

percentage increase over present salary); and the date that the increase would become effective. These plans were then submitted to higher level management for approval. See supra note 1. Thus, each salaried employee at the Gadsden plant had his or her salary reviewed at least once annually by plant management, when the time came for the awarding of merit-based raises.

   *3. Lilly Ledbetter*

Lilly Ledbetter hired in to the Gadsden plaint as a "Supervisor," the precursor to the Area Manager position, on February 5, 1979, at forty years of age. The record discloses very little about the first dozen years of Ledbetter's career. She worked as an Area Manager in several different business centers under several different BCMs. Twice, in 1986 and again in 1989, she was included in general layoffs, one lasting fifteen months. The record does not disclose who, prior to 1992, the other Area Managers in Ledbetter's immediate areas of the plant were, how Ledbetter fared against them in end-of-year performance rankings, or how her salary or the merit-based raises she received compared to theirs.

In early 1992, Ledbetter was selected to be part of the start-up team for the new RLT section of the Tire Assembly business center, which would produce large radial tires for sport utility vehicles and light trucks. From the summer of 1992 until the beginning of 1996, Ledbetter was supervised in RLT by Mike

Tucker, who was at first "Team Leader" for the RLT section and, after 1995, BCM for the entire Tire Assembly area. Four Area Managers worked together under Tucker in RLT from 1992 until 1996: Ledbetter, Bill Miller, Jimmy Todd, and Jerry Thompson.

With the sole exception of performance year 1994, Tucker consistently ranked Ledbetter at or near the bottom of her co-workers in terms of performance. In 1993, he ranked her third out of the four Area Managers, and fifth out of six salaried employees, based on her 1992 performance. Tucker suggested, and she received, a 5.28% increase over her existing salary, the largest percentage increase given to any Area Manager, though the smallest in absolute dollars. Jimmy Todd, who was ranked last, received no merit increase.

In planning for the merit increases for 1994, Tucker ranked Ledbetter last among the four RLT Area Managers, and last among the six salaried employees. He proposed that she receive a 5% merit increase, the smallest he proposed.

In 1995, Tucker awarded Ledbetter a substantial increase of 7.85%, to become effective December 1, 1995, based on her performance in 1994. The record does not reflect her exact performance ranking, but the raise she received included a 4% increase styled as an "individual performance award" and a 3.85% increase styled as a "top performance award." According to the compensation

guidelines in effect at the time, top performance awards were to be given "[f]or only the highest level of individual performance and contribution in an organization," and to "not more than 30% of the number of salaried associates in an organization." (Id.). Dual individual performance/top performance awards of the type Ledbetter received were "intended to be used to reward and recognize the uppermost level of top performer."[3] (Id. at 5).

Ledbetter was ineligible for a merit increase in 1996 because her 1995 raise became effective December 1, 1995, and the minimum time interval between raises was then thirteen months, meaning that she would not be eligible for another merit increase until January 1, 1997. She was nevertheless ranked against the twenty-three other salaried employees in Tire Assembly, which had been unified under a single BCM, Tucker, in 1995. Tucker ranked Ledbetter twenty-third out of twenty-four salaried employees, and fifteenth out of sixteen Area Managers. Jimmy Todd was ranked twenty-fourth, and both he and the person ranked twenty-second were denied raises

---

[3] Neither Ledbetter's performance appraisal for 1994 nor the merit increase planning form Tucker completed in 1995 were produced at trial, so there is no documentary record of how Ledbetter actually ranked against her colleagues. Some evidence suggests that Tucker recommended such a large increase for Ledbetter, not because she was truly a "top performer," but simply because he wanted to raise her salary and thought he could only do so significantly by giving her a "top performance award," which allowed him to exceed a 4% cap on "individual performance" awards. We credit the evidence favoring Ledbetter, however, and grant her the inference that she was truly among the best performing employees in RLT in 1994.

In March 1996, around the time that Tucker recommended raises for 1995's performance, Ledbetter was transferred to the "ARF room," a section of Tire Assembly that made smaller radial tires for passenger vehicles. Jerry Jones, who replaced Tucker as Tire Assembly's BCM in the summer of 1996, told her that she had been transferred because of her sub-standard performance in RLT.

At the end of 1996, as Jones was completing the performance appraisals for that year, Pete Buchanan, the Human Resources Manager, instructed him not to evaluate Ledbetter's or Todd's performance because, based on their 1995 performance rankings, both were slated to be included in the plant's upcoming layoffs. Jones, in turn, informed Ledbetter that she would be laid off along with Jimmy Todd and a "long list" of people in departments all over the plant.

The next day, however, Jones told Ledbetter that she was to continue working, as a substitute for other Area Managers who were or would be out on extended medical leave. Ledbetter worked in that capacity through 1997, and received the same monthly salary she had been paid since her last merit increase, in December 1995. Thus, at the end of 1997, she was still earning $3727 per month, less than all fifteen of the other Area Managers in Tire Assembly. The lowest paid male Area Manager was making $4286, roughly 15% more than Ledbetter; the

9

highest paid was making $5236, roughly 40% more than Ledbetter.[4]

Throughout 1997, Ledbetter and Jones had several conversations in which he expressed concerns about her performance. At one such meeting, in August, Jones strongly recommended that she apply for a non-supervisory Technology Engineer position that was open in the Final Finish area. He reminded her that she was still slated for layoff, and he implied that she would be laid off unless she transferred to an area not effected by the reduction in force.[5] He thought the Technology Engineer position would be good for her. Ledbetter interviewed for the position the same day and was accepted, although she continued working as an Area Manager in the ARF room for the remainder 1997.

In October, Jones transferred to another Goodyear facility and was replaced by Kelly Owen as BCM of Tire Assembly. On January 5, 1998, Ledbetter began working as a Technology Engineer—at the same salary she received in 1997. She was replaced in the ARF room by Jerry Thompson, who in turn was replaced in

---

[4] The salaries these male Area Managers were receiving included the raises they received for 1997. As stated in the text supra, Ledbetter received no raise for that year because she was slated for layoff.

[5] Jones told her that other Area Managers were to be laid off, "going to be cut," as he put it.

RLT by Brent Payne, a former tire builder Ledbetter had once supervised.[6]

Though Ledbetter was no longer working in Tire Assembly, Kelly Owen reviewed her performance, and that of the other salaried employees in the unit, for 1997. Owen ranked her twenty-third out of twenty-four salaried employees and fifteenth out of sixteen Area Managers. He ranked one male Area Manager, Dean Nance, below her. Nance, Ledbetter, and the two other lowest ranking Area Managers were all denied raises. Because Ledbetter was denied a raise for 1998, as she had been for 1997 and 1996, she remained at the same monthly salary ($3727) she had been paid since her December 1, 1995 raise.

On March 25, 1998, Ledbetter filed a questionnaire with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been forced into the Technology Engineer position and was being subjected to disparate treatment in her new department on account of her sex. In July, she filed a formal charge of discrimination with the EEOC. This time she alleged, in addition to her earlier complaints, that she had received a discriminatorily low salary as an Area Manager because of her sex.

In August, Goodyear announced that it was going to downsize the Gadsden

---

[6] Although the record is not explicit, the inescapable inference is that Thompson and Payne continued what Ledbetter had been doing—that is, standing in for the Area Managers who were on medical leave.

plant and that those who were likely be laid off would have the option of choosing early retirement. Ledbetter applied, was accepted, and retired effective November 1, 1998.

In February 1999, Goodyear announced that the Gadsden plant would close. The plant never completely shut down, however, but large-scale layoffs were made, and several Area Managers were either laid off or given the opportunity to transfer to other plants. At the height of the layoffs and transfers, the number of Area Managers in Tire Assembly—where Ledbetter had worked from 1992 to 1998—fell to from a high of sixteen to a low of four.

## B. The Proceedings in the District Court

Ledbetter filed this lawsuit on November 24, 1999.[7] After a wide-ranging jury trial that included evidence spanning the entirety of Ledbetter's nineteen-year career, four claims were submitted to the jury: a claim that Ledbetter had been the victim of gender-disparate pay as an Area Manager, in violation of Title VII, and

---

[7] Ledbetter's complaint presented multiple claims of age discrimination, sex discrimination, and retaliation in violation of Title VII, 42 U.S.C. §§ 2000e to 2000e-17 (as amended), the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34. Other than her disparate pay claim brought under Title VII, and her age-, sex-, and retaliation-based claims relating to her transfer to the Final Finish area as a Technology Engineer, each of Ledbetter's claims was abandoned or dismissed by the district court though summary judgment or judgment as a matter of law in favor of Goodyear. Because the jury found in Goodyear's favor on the transfer-related claims as we relate in the next paragraph of the text, the only claim at issue in this appeal is the Title VII disparate pay claim.

three claims, brought under Title VII and the Age Discrimination in Employment Act ("ADEA"), relating to her transfer to the Final Finish area as a Technology Engineer. These claims were that the transfer had been involuntarily forced upon her because of her sex or her age, or in retaliation for her having made complaints of sex discrimination.

After the district court denied Goodyear's motion for judgment as a matter of law,[8] the jury found for Goodyear on the transfer-related claims but returned a verdict in favor of Ledbetter on the Title VII pay claim, finding, in a special verdict,[9] that it was "more likely than not that Defendant paid Plaintiff an unequal salary because of her sex." The jury recommended $223,776 in backpay, awarded $4,662 for mental anguish, and awarded $3,285,979 in punitive damages.

Goodyear thereafter renewed its motion for judgment as a matter of law on Ledbetter's disparate pay claim and, alternatively, moved the court to grant it either a new trial or a remittitur.[10] Goodyear contended, as it had throughout the litigation, that Ledbetter's pay claim—or, more accurately, the way she had been permitted to prove her pay claim—was barred by Title VII's requirement that the conduct

---

[8] See Fed. R. Civ. P. 50(a).

[9] See Fed. R. Civ. P. 49(a).

[10] See Fed. R. Civ. P. 50(b).

13

complained of in a Title VII action must have been the focus of an EEOC charge

filed within 180 days of the occurrence of the conduct. See 42 U.S.C. § 2000e-

5(e)(1). Addressing its motion for judgment as a matter of law, Goodyear argued

that "no reasonable fact finder could conclude that [Ledbetter's] sex was a

motivating factor in a salary decision made during the period covered by [the]

EEOC charge." Assuming for sake of argument that Ledbetter had made out a case

for the jury, Goodyear contended that it was entitled to a new trial because the court

had erred in permitting Ledbetter to challenge every annual review of her salary,

from 1979 on, all but one of which fell outside the 180-day period created by her

EEOC charge.

The district court denied Goodyear's motion for judgment as a matter of law

but remitted the entire award to $360,000, including the statutory maximum of

$300,000 in compensatory and punitive damages and $60,000 in backpay. Of

Goodyear's arguments on the 180-day issue and the sufficiency of the evidence, the

court said simply that

> [t]he jury's finding that Plaintiff was subjected to a gender disparate
> salary is abundantly supported by the evidence. . . .
>      The jury could reasonably have found that Terry Amberson is
> an appropriate comparator.[11] Apparently, both he and the Plaintiff

---

[11] Terry Amberson was the highest paid of five male Area Managers Ledbetter had used
as comparators. Each had worked in Tire Assembly—though not necessarily in her section or

14

were paid the same salary on April 1, 1979, and again on April 16, 1979. Plaintiff's Exhibit ("PX") 201. The jury could reasonably have concluded that but for the gender discrimination, their salaries would have been the same up to November 1, 1998. It could have found that in the 1996-1998 period, Plaintiff's base annual salary was $44,724; and that Amberson's base salary was $59,028. (footnote omitted).

The court remitted the punitive damages to $295,338, the amount which, when combined with the $4,662 mental anguish award, reached the $300,000 cap on compensatory and punitive damages in Title VII actions against employers with more than 500 employees. See 42 U.S.C. § 1981a(b)(3)(D) (limiting damages awarded under Title VII to $300,000 "in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year"). Ledbetter accepted the remittitur. Judgment was therefore entered for $360,000, plus attorneys' fees and costs. Goodyear timely appealed.[12]

## II. Standard of Review

We review de novo the denial of a motion for judgment as a matter of law, applying the same standard as the district court. E.g., Russell v. N. Broward Hosp., 346 F.3d 1335, 1343 (11th Cir. 2003). Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient

room—during Ledbetter's final years as an Area Manager.

[12] Ledbetter did not cross-appeal; accordingly, she does not challenge any of the district court's rulings.

15

evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). When the merits of the motion turn on the sufficiency of the evidence, we review the entire record, examining all evidence, by whomever presented, in the light most favorable to the nonmoving party, and drawing all reasonable inferences in the nonmovant's favor. See Russell, 346 F.3d at 1343; Brochu v. City of Riviera Beach, 304 F.3d 1144, 1154 (11th Cir. 2002); Lambert v. Fulton County, Ga., 253 F.3d 588, 594 (11th Cir. 2001). Moreover, we do not assume the jury's role of weighing conflicting evidence or inferences, or of assessing the credibility of witnesses. Brochu, 304 F.3d at 1154-55 (quoting Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir.2001)).

> Thus, although [we must] review the record as a whole, [we] must disregard all evidence favorable to the moving party that the jury [was] not required to believe. That is, [we] give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, at 299-300 (2d ed.1995)).

At the end of this review, we will reverse the denial of judgment as a matter

16

of law only if "the facts and inferences point overwhelmingly in favor of [the movant], such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir.1997)). "It bears repeating," however, "that a mere scintilla of evidence does not create a jury question. [Judgment as a matter of law] need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in [the] evidence," Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1230 (11th Cir. 2001) (quoting Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)), enough such that a reasonable jury could find for the nonmovant.

### III. Analysis

Goodyear's argument regarding Ledbetter's pay claim is two-pronged. First, Goodyear argues that Title VII's timely-filing requirement limited Ledbetter to challenging the one affirmative decision directly affecting her pay that was made within the 180-day limitations period created by her EEOC charge: Kelly Owen's February 1998 decision not to increase her salary for that year. Second, Goodyear argues that it is entitled to judgment as a matter of law because no reasonable jury could find that decision to have been improperly motived by gender discrimination.

17

Our analysis proceeds as follows. In Part III.A., we consider how Title VII's timely-filing requirement applies to this specie of disparate pay claims—that is, those in which the salary or pay level being challenged was periodically reviewed and re-established by the defendant-employer. We conclude that in the search for an improperly motivated, affirmative decision directly affecting the employee's pay, the employee may reach outside the limitations period created by her EEOC charge no further that the last such decision immediately preceding the start of the limitations period. We do not hold that an employee may reach back even that far; what we hold is that she may reach no further. In Part III.B., we apply this holding to Ledbetter's claim. We conclude that no reasonable juror could find intentional discrimination in either of the two decisions setting Ledbetter's salary as it existed during the limitations period.

A. The Timely-Filing Requirement

Under § 706 of Title VII, 42 U.S.C. § 2000e-5(e)(1), only those "unlawful employment practice[s]" that are complained of in a timely-filed charge of discrimination to the EEOC can form the basis for Title VII liability. See, e.g., City of Hialeah v. Rojas, 311 F.3d 1096, 1102 (11th Cir. 2002) ("If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to

18

treat the unlawful practice as if it were lawful."). For claims arising in so-called "non-deferral" states, such as Alabama, to be timely, the applicable charge must have been filed within 180 days "after the alleged unlawful employment practice occurred." § 2000e-5(e)(1).[13]  Therefore, only those "practice[s]" that "occurred" within 180 days of the operative EEOC charge can form the basis for Title VII liability.

The parties both assume for purposes of this appeal that the operative "charge" in this case is the EEOC questionnaire Ledbetter filed on March 25, 1998, and that her pay claim—which was included in her formal charge filed in July 1998, but not the questionnaire—should relate back to the date of the questionnaire.[14] Measuring from March 25, 1998, the 180-day period began to run on September 26, 1997.  The question, therefore, is whether Ledbetter made out a claim for disparate treatment in pay based on conduct occurring after September 26, 1997.

*1. The <u>Morgan</u> Decision.*

The Supreme Court substantially clarified the operation of Title VII's timely-filing requirement in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101,

---

[13]  In "deferral" states—those states that have an EEOC-like state administrative agency—a charge of discrimination must first be filed with the state agency, and the filing period is extended to 300 days.

[14]  We do not pass on the correctness of these assumptions.

122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), so we begin our analysis there. In

Morgan, the Supreme Court granted certiorari to consider "whether, and under what

circumstances, a Title VII plaintiff may file suit on events that fall outside [the

timely-filing] period." Id. at 105, 122 S. Ct. at 2068. On that question, the Court

reached two different answers, one for each of the two types of claims at issue in the

case: (1) disparate treatment and retaliation claims challenging "discrete

discriminatory or retaliatory acts," and (2) a claim alleging a hostile work

environment. See id.

The Court held that the timely-filing requirement erects an absolute bar on

recovery for "discrete discriminatory or retaliatory acts" occurring outside the

limitations period. In doing so, it rejected the Ninth Circuit's "serial violations"

doctrine, eschewing the notion "that so long as one act falls within the charge filing

period, [time-barred] discriminatory and retaliatory acts that are plausibly or

sufficiently related to that act may also be considered for purposes of liability." Id.

at 114, 122 S. Ct. at 2072-73. The Court reasoned that "discrete acts of

discrimination" such as "termination, failure to promote, denial of transfer, or

refusal to hire" are easy to identify, and each "constitutes a separate actionable

'unlawful employment practice.'" Id. at 114, 122 S. Ct. at 2073. Because each is an

identifiable violation of Title VII, "[e]ach discrete discriminatory act starts a new

20

clock for filing charges alleging that act." Id. at 113, 122 S. Ct. at 2072. In such cases, there is no issue about when, in the language of the statute, the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). It "occurred" on the day that it "happened." Morgan, 536 U.S. at 109, 122 S. Ct. 2070. A party, therefore, must file a charge within either 180 or 300 days of the date of a discrete discriminatory or retaliatory act or lose the ability to recover for it, id. at 113, 122 S. Ct. at 2072, regardless of whether the time-barred acts are closely related to acts alleged in a timely-filed charge. Pre-limitations acts can be used, where relevant, "as background evidence in support of [the] timely claim," Id. at 113, 122 S. Ct. at 2072, but they cannot themselves form the basis for liability.

The Court distinguished claims in which the plaintiff alleges that he or she was subjected to a hostile work environment. For those claims, the Court held, "consideration of the entire scope of [the] claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." Id. at 105, 122 S. Ct. at 2068. The Court reasoned that

> [h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be

21

actionable on its own. Such claims are based on the cumulative effect of individual acts.

Id. at 115, 122 S. Ct. at 2073 (citations omitted). "Given," the Court said, "that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." Id. at 118, 122 S. Ct. at 2075.

We think it clear that pay claims of the type Ledbetter asserts are governed by that part of the Morgan decision addressing claims alleging "discrete acts of discrimination." It is fundamental that for a Title VII plaintiff to prevail on any type disparate treatment claim, he or she must point to some specific, conscious conduct that was tainted by the alleged improper consideration (be it "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1)). In a case in which the plaintiff complains of discriminatory pay, there are only two possible sources of such conduct: the decisions setting the plaintiff's salary level or pay rate, and the issuance of paychecks reflecting those decisions. Whether it is a pay-setting decision or the issuance of a confirming paycheck that is viewed as the operative act of discrimination, the act is, like "termination, failure to promote, denial of transfer, or refusal to hire," Morgan, 536 U.S. at 114, 122 S. Ct. at 2073, discrete in time, easy to identify, and—if done with the requisite intent—independently actionable.

22

If an employee is denied a raise, given a pay cut, or hired at a deflated pay grade because of a prohibited consideration, the statute is violated and the employee can file suit the moment the decision is made. The decision would be no less unlawful if the employee were to quit the next day in exasperation and never receive a paycheck reflecting her unlawful pay rate; proving damages might be problematic, but establishing liability would not. Similarly, if the act complained of is the issuance of a discrete discriminatory paycheck (or paychecks), then the issuance of the challenged paycheck completes the "alleged unlawful employment practice" for purposes of the timely-filing requirement. Pay claims do not, therefore, have those characteristics that led the Court to devise a separate rule governing the timing of hostile work environment claims: The "unlawful employment practice" can be said to occur on a particular day (though it may be repeated on multiple days), and a single discriminatory act is actionable on its own. The alleged discriminatory behaviors need not accumulate to some critical mass to become actionable.[15]

_____

[15] The Seventh Circuit has reached the same conclusion. See Reese v. Ice Cream Specialties, Inc., 347 F.3d 1007, 1010 (7th Cir. 2003) (concluding that "it is relatively easy to rule out" the possibility that disparate pay claims should be treated like hostile environment claims after Morgan); Hildebrandt v. Ill. Dep't of Natural Res., 347 F.3d 1014, 1028 (7th Cir. 2003) ("Using Morgan as our guide . . . we must conclude that each of Dr. Hildebrandt's paychecks that included discriminatory pay was a discrete discriminatory act, not subject to the continuing violation doctrine. Therefore, Dr. Hildebrandt may only recover for the discriminatory pay received within the statute of limitations period.") (footnote omitted); cf. Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 119 (2d Cir. 1997) (concluding in a pre-Morgan Equal Pay Act case that "a claim of discriminatory pay is fundamentally unlike other

Under Morgan, therefore, Ledbetter can state a timely cause of action for disparate pay only to the extent that the "discrete acts of discrimination" of which she complains occurred within the limitations period created by her EEOC questionnaire. Any acts of discrimination affecting her salary occurring before then are time-barred.

*2. Ledbetter's Claim.*[16]

It is undisputed that Ledbetter's claim is not entirely time barred. In February 1998, after Ledbetter had transferred to the Final Finish area to assume the Technology Engineer position, her pay level was reviewed by Kelly Owen, who decided not to recommend that she receive any raise. That decision was affirmed by higher level management at the plant. Because an affirmative decision directly affecting Ledbetter's pay was made within the limitations period (i.e., after September 26, 1997), she may at least challenge that decision as discriminatory. The claim is identical in form to the raise-denial claims courts routinely consider.

---

claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action").

[16] We note that neither party has argued that equitable considerations require deviation from straight-forward application of the 180-day filing period. See Morgan, 536 U.S. at 121-22, 122 S. Ct. at 2076-77 (reaffirming that the timely-filing requirement is subject to waiver, estoppel, and equitable tolling, and holding that defendants may avail themselves of the defense of laches). We therefore have no occasion to consider, for example, the timing and extent of Ledbetter's awareness of the disparity between her salary and those of her co-workers.

The rub is that Ledbetter did not want to stop at the 1998 raise decision because doing so would have (1) limited the damages she could have recovered, (2) rendered useless evidence relevant only to other persons in the plant upon which she wanted the jury to rely, and (3) forced her to prove that Owen acted with discriminatory intent. Instead, what Ledbetter did—what the district court allowed her to do—was to point to the substantial disparity between her salary and those of the male Area Managers in Tire Assembly at the end of her career, put on circumstantial evidence that persons having control over her pay earlier in her career had discriminatory animus toward women, show that other female Area Managers in the plant were paid less than their male co-workers, and then put the onus on Goodyear to provide a legitimate, non-discriminatory reason for every dollar of difference between her salary and her male co-workers' salaries. This necessarily put at issue every salary-related decision made during Ledbetter's nineteen-year career.

To support her argument that she was entitled to prove her claim in this way, Ledbetter cites a series of pre-Morgan cases that, attempting to follow the Supreme Court's decision in Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L. Ed. 2d 315 (1986), essentially carved out a doctrine for applying the timely-filing requirement to disparate pay claims. Though the circuits took slightly different

approaches, many held prior to <u>Morgan</u> that a Title VII claim challenging an employee's pay was not time-barred so long as the plaintiff received within the limitations period at least one paycheck implementing the pay rate the employee challenged as unlawful.[17]

---

[17] This included at least the Third, Fourth, Sixth, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits. <u>See</u> <u>Calloway v. Partners National Health Plans</u>, 986 F.2d 446 (11th Cir. 1993) (relying on <u>Bazemore</u> in holding that a plaintiff could challenge her initial wage rate as unlawful, even though it had been established outside the limitations period, because she continued to receive paychecks within the limitations period); <u>Cardenas v. Massey</u>, 269 F.3d 251, 258 (3d Cir. 2001) ("in a Title VII case claiming discriminatory pay, the receipt of each paycheck is a continuing violation"); <u>Brinkley-Obu v. Hughes Training, Inc.</u>, 36 F.3d 336, 346 (4th Cir. 1994) ("[I]n a compensation discrimination case, the issuance of each diminished paycheck constitutes a discriminatory act"); <u>Hall v. Ledex, Inc.</u>, 669 F.2d 397, 398 (6th Cir.1982) ("[T]he discrimination [against the plaintiff] was continuing in nature. [She] suffered a denial of equal pay with every check she received."); <u>Ashley v. Boyle's Famous Corned Beef Co.</u>, 66 F.3d 164, 168 (8th Cir.1995) (en banc) ("Ashley's Title VII pay claim is timely because she received allegedly discriminatory paychecks within 300 days prior to the filing of her administrative charge.") (citations omitted), <u>abrogated on other grounds by</u> <u>Morgan</u>, 536 U.S. at 101, 122 S. Ct. at 2061; <u>Gibbs v. Pierce County Law Enforcement Support Agency</u>, 785 F.2d 1396, 1400 (9th Cir. 1986) ("As each plaintiff in the instant action filed charges with the EEOC within 180 days of a [wage] payment, we conclude that plaintiffs' action is not time-barred."); <u>Goodwin v. Gen. Motors Corp.</u>, 275 F.3d 1005, 1009 (10th Cir. 2002) ("<u>Bazemore</u> . . . has taught a crucial distinction with respect to discriminatory disparities in pay, establishing that a discriminatory salary is not merely a lingering effect of past discrimination—instead it is itself a continually recurring violation."), <u>cert. denied</u>, 537 U.S. 941, 123 S. Ct. 340, 154 L. Ed. 2d 248 (2002); <u>Anderson v. Zubieta</u>, 180 F.3d 329, 335-37 (D.C. Cir. 1999) (holding that under <u>Bazemore</u>, the continued application of a discriminatory compensation scheme is itself an actionable violation, and that the plaintiffs could therefore "be made whole for those paychecks received during" the applicable limitations period).

Some circuits relied on the so-called "continuing violations" doctrine, variously defined, <u>e.g.</u>, <u>Calloway</u>, 986 F.2d at 448-49; <u>Cardenas</u>, 269 F.3d at 258, while others expressly rejected that label, <u>e.g., Gandy v. Sullivan County, Tenn.</u>, 24 F.3d 861, 864-65 (6th Cir. 1994) (EPA claim). Some restricted the damages recoverable to the pay lost as a result of paychecks received within the timely-filing period, <u>e.g.</u>, <u>Brinkley-Obu</u>, 36 F.3d at 346, n.22; <u>Ashley</u>, 66 F.3d at 167-68, while others at least in certain circumstances allowed the plaintiff to recover for the full two-year backpay period specified in 42 U.S.C. § 2000e-5(g)(1), <u>e.g.</u>, <u>Goodwin</u>, 275 F.3d at 1011 (misreading <u>Ashley</u> as agreeing with this result), <u>Anderson</u>, 180 F.3d at 335-37.

The Second Circuit never addressed the issue in the context of Title VII, but pre-<u>Morgan</u>

26

Assuming that these cases survive Morgan, they do not stand for the broad proposition Ledbetter urges. It is one thing to say that a claim is not entirely time barred because the discriminatory decision being challenged continued to be periodically implemented through paychecks issued within the limitations period. It is quite another to say that the bare issuance of a lower-than-wished-for paycheck within the limitations period opens the door for a full inquiry into the motivations of every person who ever made a decision contributing to the plaintiff's pay level as it existed during the limitations period. In other words, the cases on which Ledbetter relies hold simply that pay claims are not time-barred if (allegedly) unlawful paychecks were issued within the limitations period; they do not speak to how far back in time the plaintiff may reach in looking for the intentionally discriminatory act that is the central, requisite element of every successful disparate treatment claim. E.g., Denney v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001) ("Disparate treatment claims require proof of discriminatory intent[,] either through

---

decisions under other statutes suggest it would have adopted the majority position. See Connolly v. McCall, 254 F.3d 36, 41 (2d Cir. 2001) (relying on Bazemore in holding in a § 1983 case that "application of a discriminatory policy" within the limitations period preserves a claim against that policy, even if the policy was instituted outside the limitations period); Pollis v. New School for Social Research, 132 F.3d 115, 119 (2d Cir. 1997) (holding that Equal Pay Act claims re-accrue with the receipt of each challenged paycheck); Kim v. Dial Serv. Int'l, Inc., 159 F.3d 1347 (2d Cir. 1998) (unpublished table decision) (holding in a § 1981 case that "under Bazemore, each discriminatory paycheck constituted a new violation for which suit could be brought within the statute of limitations period beginning with its occurrence").

direct or circumstantial evidence.")

Of course, the necessary implication of these cases is that a plaintiff whose claim is preserved by the continued issuance of improperly low paychecks can look some distance back in time for the underlying, intentionally discriminatory decision. Unless there is a claim that the person—or, more likely today, the computer—who actually issued the paychecks in question did so with intent to discriminate, the operative act of discrimination will always be, not the act of issuing paychecks, but the act of making the underlying decision about what the plaintiff should be paid. Thus, if a claim is timely only because of the continued receipt of paychecks within the limitations period, it must be that the plaintiff can point to a decision outside the limitations period as the offending act.

There must, however, be some limit on how far back the plaintiff can reach. If it were otherwise, the timely-filing requirement would be completely illusory in many pay-related Title VII cases. So long as the plaintiff received one paycheck within the limitations period that was based on the pay level he or she objects to, the plaintiff could effectively call into question every decision made contributing to his or her being paid at that level. This result would be directly contrary to the central purposes of the time-filing requirement: to "encourag[e] prompt resolution of employment disputes," Hill v. Ga. Power Co., 786 F.2d 1071, 1076 n.9 (11th Cir.

28

1986), and "to protect employers from the burden of defending claims arising from employment decisions that are long past," Del. State College v. Ricks, 449 U.S. 250, 256-57, 101 S. Ct. 498, 503, 66 L. Ed. 2d 431 (1980).

Limits on how far into the past the plaintiff can look for an intentionally discriminatory decision are most obviously warranted where, as here, the employee's pay level was subjected to periodic re-assessment through regularly scheduled raise decisions. In such cases, the timing of the employer's compensation system creates one, obviously preferable opportunity for an employee to make any pay-related complaints: the point at which the employee's salary is reviewed and he or she is dissatisfied with the result. We think, therefore, that at least in cases in which the employer has a system for periodically reviewing and re-establishing employee pay, an employee seeking to establish that his or her pay level was unlawfully depressed may look no further into the past than the last affirmative decision directly affecting the employee's pay immediately preceding the start of the limitations period. Other, earlier decisions may be relevant, but only to the extent they shed light on the motivations of the persons who last reviewed the employee's pay, at the time the review was conducted. See, e.g., Downey v. So. Nat. Gas Co., 649 F.2d 302, 305 (5th Cir. 1981) ("Although Downey's claims relating to the 1974 demotion and failure to transfer are time barred, these actions should be allowed as

29

evidence on the question of whether Downey was constructively discharged.  We observe that "(w)hile some or most of this evidence may concern time-barred conduct, it is relevant, and may be used to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives." (quoting Crawford v. Western Electric Co., 614 F.2d 1300, 1314 (5th Cir. 1980))).[18]

Despite Ledbetter's contentions, our decision in Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993), is not to the contrary.  In Calloway, the plaintiff, a black woman, had accepted a secretarial position at a salary lower than her equally or less qualified white predecessor had been offered

---

[18]  Moreover, the employee is limited to recovering for those paychecks received within the limitations period.  This is the necessary consequence of Morgan's holding that the timely-filing requirement "precludes recovery for discrete acts of discrimination or retaliation that occur outside the [filing] period," Morgan, 536 U.S. at 105, 122 S. Ct. at 2068.  Obviously, "the timely filing provision was not meant to serve as a specific limitation  . . . on damages." Id. at 119, 122 S. Ct. at 2075.  But for claims based on discrete acts of discrimination, the "obvious consequence" of the strict limitation on liability is a correspondingly strict limitation on damages.  Id. at 126, 122 S.Ct. at 2079 (O'Connor, J., concurring in part and dissenting in part).  The other circuits to address this issue after Morgan have all reached the same conclusion.  See Forsyth v. Federation Employment & Guidance Serv., 409 F.3d 565, 573 (2d Cir. 2005) ("Any paycheck given within the statute of limitations period [is] actionable, even if based on a discriminatory pay scale set up outside of the statutory period.  But, a claimant [can] only recover damages related to those paychecks actually delivered during the statute of limitations period."); Shea v.  Rice, 409 F.3d 448, 451 (D.C. Cir. 2005) ("Morgan dooms any hope Shea entertained that his current (and allegedly discriminatory) paychecks can resurrect his otherwise untimely challenges to the paychecks he received before January 12, 2001—or 180 days before he filed his grievance"); Hildebrandt, 347 F.3d at 1028 ("Using Morgan as our guide . . . we must conclude that each of Dr. Hildebrandt's paychecks that included discriminatory pay was a discrete discriminatory act, not subject to the continuing violation doctrine.  Therefore, Dr. Hildebrandt may only recover for the discriminatory pay received within the statute of limitations period. " (footnote omitted)).

30

nine months prior. In addition, when the plaintiff left the company, the defendant replaced her with another white woman of equal or lesser qualifications whom it paid more than it had the plaintiff. The limitations period created by the EEOC charge supporting the plaintiff's claim did not reach back to the date she was hired. The defendant therefore argued that the claim was barred because the only conduct that occurred within the limitations period—the issuance of paychecks implementing the plaintiff's disparate pay rate—was simply "the present consequence" of a time-barred act of discrimination: hiring the plaintiff at a discriminatory initial wage rate. Id. at 448; see also United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). The district court found that the plaintiff had proven intentional discrimination in her initial wage assignment, but it agreed with the defendant that the claim was time-barred.

A panel of this court reversed. Relying on Bazemore and on our own version of the "continuing violations" doctrine, the panel reasoned that "[w]hen the claim is one for discriminatory wages, the violation exists every single day the employee works [for the wages she challenges as unlawful]." Calloway, 986 F.2d at 448-49 (citing Bazemore, 478 U.S. at 396, n.6; 106 S.Ct. at 3006, n.6.). Thus, the defendant "discriminated against [the plaintiff] not only on the day that it offered her less than her white predecessor, but also on every day of her employment." Id.

31

(citing Bazemore, 478 U.S. at 395, 106 S. Ct. at 3006 ("Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII . . . .")).

Ledbetter argues that because the plaintiff in Calloway was allowed to prove her claim based on the intentional discrimination reflected in her initial wage assignment, she should be allowed to do the same; if she can prove intentional discrimination in any pay decision during her career, even the setting of her initial salary, she can effectively borrow that intent and impute it to the paychecks she received during the limitations period. Calloway, however, did not involve, as this case does, an employee whose pay had been reviewed and re-established over a dozen times. There is no indication in the opinions of the district court or the panel in Calloway that the employer had in place any sort of system like Goodyear's, giving the plaintiff regular opportunities to complain of improperly deflated pay and to seek a raise. Indeed, there is no indication that any decisions were made about the Calloway plaintiff's pay rate between the initial date of hire and the start of the limitations period. In such cases, if a claim is allowed to go forward only because paychecks were received within the limitations period, then of course any intentional discrimination will have to be located in the initial wage assignment. In short, we believe that Calloway belongs in a different category of pay-related cases

32

and is fully consistent with the rule we announce today.

We think <u>Morgan</u> may indicate that the paycheck-as-discriminatory-act cases, including <u>Calloway</u>, read <u>Bazemore</u> too broadly and that it therefore remains an open question whether a disparate-pay plaintiff, in contrast to a pattern-and-practice pay plaintiff, should be able to challenge <u>any</u> decision made outside the limitations period.[19] We need not address that question today, however. Even if we assume that the paychecks Ledbetter received within the limitations period allowed her to attack as discriminatory the last affirmative decision affecting her pay before the beginning of the period, that decision—the Gadsden plant administrators' decision not to allow Jerry Jones to consider her for a raise in 1997—is not one that any reasonable jury could find discriminatory.

## B. Sufficiency of the Evidence

We conclude, as we must, that Ledbetter was permitted to challenge the one raise decision that was made within the limitations period: Kelly Owen's decision to recommend that she not receive any raise in 1998. Further, we assume that, to

---

[19] <u>But see</u> <u>Reese v. Ice Cream Specialities</u>, 347 F.3d 1007, 1013 (7th Cir. 2003) ("[T]he Court has left a . . . narrow channel for Title VII plaintiffs who wish to complain that their paychecks, in compensation for work they have presently performed and completed in pay periods within the limitations period, are discriminatorily low because of an earlier act that occurred outside the limitations period."); <u>accord</u> <u>Forsyth v. Federation Employment & Guidance Service</u>, 409 F.3d 565, 572-73 (2d Cir. 2005); <u>Shea v. Rice</u>, 409 F.3d 448, 453-54 (D.C. Cir. 2005); <u>Hildebrandt</u>, 347 F.3d at 1027.

establish that intentional discrimination tainted the paychecks she received within the limitations period but before Owen's decision, Ledbetter could attack as discriminatory the plant administrators' decision not to allow Jerry Jones to consider her for a raise in 1997. The question therefore becomes whether Ledbetter presented sufficient evidence for a reasonable jury to conclude that either of these decisions violated Title VII.

Title VII, in pertinent part, makes it unlawful for an employer to "discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In this circuit, individual disparate-pay claims brought under Title VII are governed by the familiar burden-shifting framework set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), and their progeny. See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir.1992) (adopting the McDonnell Douglas framework for disparate pay claims). Under the McDonnell Douglas/Burdine approach,

> a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males. Once a prima facie case is established, the defendant must articulate a legitimate, non-discriminatory reason for the pay disparity. This burden is "exceedingly light"; the defendant

34

must merely proffer non-gender based reasons, not prove them. Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent. In other words, the plaintiff must show that a discriminatory reason more likely than not motivated [the employer] to pay her less.

Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994) (citations and quotation marks omitted).

This burden-shifting framework does not relieve the plaintiff of her burden of persuasion; she ultimately bears the burden of showing by a preponderance of the evidence that she was paid at a disparate rate out of intent to discriminate on the basis of sex. See Burdine, 450 U.S. at 253, 101 S.Ct. at 1089 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."). Instead, the McDonnell Douglas/Burdine approach simply switches temporarily the burden of production, forcing the defendant (after the plaintiff has established a prima facie case) to produce a target at which the plaintiff can aim her proof—the "legitimate, non-discriminatory reasons" it offers for the pay disparity. "[R]ejection of the defendant's proffered reasons" does not compel judgment for the plaintiff as a matter of law, Hicks, 509 U.S. at 511, 113 S. Ct. at 2749, but in the usual case,[20]

---

[20] It is not always the case that "the plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, [will] permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148, 120 S. Ct. at

rejection of the reasons offered by the defendant, combined with the evidence supporting the prima facie case, "will permit the trier of fact to infer the ultimate fact of intentional discrimination." Id.; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

If, therefore, the plaintiff comes forward with sufficient evidence to establish that "she occupies a job similar to that of higher paid males," Meeks, 15 F.3d at 1019, and the defendant in response articulates legitimate, nondiscriminatory reasons for the pay disparity, the sufficiency of the evidence on the ultimate issue of intentional discrimination generally turns on whether a reasonable jury could find that the defendant's justification for the disparity is pretextual. The question becomes whether "the plaintiff has demonstrated 'such weaknesses, implausibilities,

2109.

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Id.

36

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)). "[T]he risk of nonpersuasion always remains with the plaintiff." Meeks, 15 F.3d at 1019. "If the evidence is in equipoise on the issue of whether a salary differential is based on a factor other than sex, . . . the employer prevails . . . ." Id.

In this case, Ledbetter does not dispute that Goodyear came forward with legitimate, nondiscriminatory reasons for Ledbetter's being passed over for raises in 1997 and 1998. The sole issue, therefore is whether a reasonable jury could have found those reasons to be pretexts for intentional sex discrimination. The answer is a clear "no."

*1. The 1998 Decision.*

There simply was no evidence produced at trial impugning Kelly Owen's motives in recommending, in February 1998, that Ledbetter receive no raise in 1998. Ledbetter was ranked twenty-third out of twenty-four employees in Tire Assembly, and fifteenth out of the sixteen Area Managers, based on her performance in 1997. That ranking was the same in both the raw performance

scores taken directly from the 1997 performance appraisals and in the weighted scores Owen used to create the business-center-wide rankings. One male Area Manager, Dean Nance, was ranked below Ledbetter, and he and the two males ranked directly above Ledbetter were all denied raises, just as Ledbetter was.

There was no evidence that Owen purposefully underrated Ledbetter's performance for 1997. There was no evidence that he bore any ill will towards Ledbetter or toward women generally. Moreover, Owen told Ledbetter that she would not be receiving a raise when he met with her to discuss her performance appraisal, and she made no complaint about being discriminated against. She also neglected to make any such complaint when she went to EEOC a month later about her alleged mistreatment in the Technology Engineer position. In short, Ledbetter failed to produce a scintilla of evidence from which a reasonable jury could have found that Owen's decision was in any way affected by her sex.[21]

*2. The 1997 Decision.*

---

[21] Ledbetter did produce some evidence tending to undermine her 1997 performance appraisal. She testified that some of the audits upon which Owen would have relied in completing her performance appraisal were purposefully falsified by Mike Maudsley, the business center's Production Auditor. This, however, is relevant only to the accuracy of Owen's rankings, not to his intent. It is not discriminatory to honestly rely on inaccurate information, see Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261 (11th Cir. 2001); Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987), and there was no evidence that Owen acted any way but in good-faith reliance on the information he was using.

The same is true of Goodyear's decision not to consider Ledbetter for a raise in 1997. The evidence uniformly confirmed that Ledbetter and others were selected in 1996 to be included in layoffs that were expected in 1997, and that Ledbetter avoided actually being out of work during 1997 only because one or more other Area Managers were out on extended medical leave and she was able to work as a substitute. The only reasonable inference is that these layoffs were instituted as the first step in the production cutbacks that ultimately led to the plant's being all but completely shut down. Just a year and half after Jones first informed Ledbetter that she was slated for layoff, Goodyear announced in August 1998 the reduction-in-force that Ledbetter volunteered to be included in. And it was only two years later, in February 1999, that Goodyear announced that the entire plant would close. Many layoffs and transfers were made, and the number of Area Managers in the Tire Assembly area dwindled from sixteen, when Ledbetter was there, to as low as four.

The uncontradicted evidence also established that Ledbetter's impending layoff was the reason for her being denied a raise in 1997. Jones's testimony to this effect went unimpeached and uncontradicted, and there is no suggestion in the record that Ledbetter properly should have been considered for a raise

notwithstanding her impending layoff.[22] Moreover, common sense suggests that scarce raise dollars would not normally be awarded an employee whose supervisors considered her departure to be imminent.

Because it was clear that Ledbetter was scheduled for layoff and was therefore ineligible for a raise in 1997, her only avenue for undermining the decision not to award her a raise was to attempt to raise the inference that she was improperly selected for the layoff. Her theory, in sum, was that she was on the "layoff list" "so they wouldn't have to give me a raise." Ledbetter pointed to two threads of evidence that could conceivably support this theory: (1) evidence that Jerry Jones and a Plant Manager, Richard O'Dell, bore resentment against her or against women generally; and (2) evidence intended to show that she performed too well in 1995 for the company's decision to be credible.

Ledbetter's attempt to suggest that she performed too well in 1995 to be selected for layoff failed completely.[23] Mike Tucker ranked Ledbetter twenty-third

[22] On appeal, Ledbetter argues for the first time that the layoff planned in late 1996 does not explain her being denied a raise in 1997 because it was clear by the time Jones recommended merit increases for 1997 that she would never be laid off. The evidence Ledbetter relies upon in making this argument—including evidence regarding the merit increases that were awarded by Jones in 1997—was not made part of the record of this case. Moreover, Ledbetter's own testimony supports the conclusion that she was still slated for layoff at least as late as August, 1997, well after the merit-increase planning for 1997 would have been done. She testified that Jones told her in August that she was still slated for layoff.

[23] There is no basis for questioning Goodyear's evidence that the layoff selections were based on 1995 performance appraisals. Jones testified that he was told by Pete Buchanan that

40

out of the  twenty-four employees in Tire Assembly for the 1995 performance year.[24]  Jimmy Todd, who was also included in the layoff, was ranked last.   Thus, the two lowest performing Area Managers in Tire Assembly in 1995—the last year for which there were completed performance appraisals—were selected for the layoff. This makes inherent sense; that is, that the managers of a plant in dire financial straits (as the Gadsden plant undisputedly was) would choose for layoff those managers with the poorest recent performance history.

Ledbetter produced no evidence undermining Tucker's evaluation of her performance or suggesting that he had improper motives.  Moreover, Ledbetter's next-to-last ranking in 1995 is consistent with her last-place ranking for 1993  and her next-to-last rankings for 1992 and 1997.  There simply was no reasonable, performance-based reason for questioning Ledbetter's selection for layoff.[25]

The same is true of Ledbetter's attempt to impugn the motivations of Jones

Ledbetter and Todd had been selected layoff based on their 1995 performance.  Ledbetter testified that Jones told her what Buchanan had said.  And Mike Tucker testified that he was aware at the time that the selections were being made based on 1995 performance appraisals, and that it was "common knowledge" in the plant that both Ledbetter and Todd had been selected.

[24]  There is absolutely no evidence to support Ledbetter's repeated suggestion, at trial and on appeal, that her "top performance award" was based on her performance in 1995, rather than 1994.  See supra note 3.

[25]  We must credit the evidence that Ledbetter was among the best-performers in the RLT section of Tire Assembly in 1994.  However, Ledbetter's solid performance in 1994 does not permit the inference, over direct evidence to the contrary, that she continued to be a top performer in 1995, especially given her otherwise consistently low ratings in other years.

41

and O'Dell, because Ledbetter produced no evidence that either of these men played any role in selecting her for the layoff. Goodyear's evidence that the layoff decision was made at a level of authority above Jerry Jones went uncontradicted and unimpeached; nothing in the record indicates that Jones had any role in this decision other than delivering the bad new to Ledbetter. Ledbetter's attempt to suggest that Jones bore ill will towards her because of her sex[26] therefore casts no light on the 1997 decision. The same is true of Ledbetter's testimony regarding sexist comments allegedly made by Richard O'Dell, who Ledbetter testified was Plant Manager at some unidentified point "toward[] the end of [her] career."[27] If O'Dell

---

[26] Ledbetter attempted to establish that Jones treated her poorly in various ways throughout 1997. She claimed to have been ignored in meetings and denied information she needed to perform her job; she pointed to a memoranda in which Jones insensitively addressed his Area Managers as "boys" and then, after she complained, as "Boys and Lady"; and she testified that Jones had retaliated against her in the early 1980s when he was a Human Resources officer and she complained of sexual harassment by her co-workers.

Other evidence introduced by Ledbetter herself suggests that Jones treated her fairly. He was her BCM from 1985 until her temporary layoff in May 1986, and Ledbetter testified that she could recall no problems with him during this time. She also produced a note that Jones had sent her when she was selected to be part of the start-up team for the new RLT section of Tire Assembly in 1992. In it, Jones congratulated Ledbetter on her new assignment, saying that she had "worked very hard," had "made a lot of improvement in the last few years," and "deserve[d] the opportunity." She testified that she considered this a sincere compliment from Jones.

[27] According to Ledbetter, O'Dell told her "that [the] plant did not need women, that we didn't help it, we caused problems." Piling hearsay upon hearsay, she also testified (over Goodyear's objection) that one of her former supervisors (she did not specify who) told her that O'Dell asked Jerry Jones "[w]hen [he was] going to get rid of the drunk and the damn woman." The only other mention of O'Dell in the record is his unauthenticated signature on the merit increase plan for Tire Assembly for 1998, which was completed by Kelly Owen. As to the timing of O'Dell's alleged comments, the records suggests only that they were made after Jones became her BCM and "toward[] the end of [her] career."

42

was Plant Manager when Ledbetter was slated for layoff or when she was denied a raise in 1997, or if he had any role in these decisions, Ledbetter produced no evidence of it. His comments were therefore alone insufficient to support an inference of discrimination. Cf. Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999) ("In several age discrimination cases . . . this court has explained that comments by non-decisionmakers do not raise an inference of discrimination . . . .").

Moreover, the jury's rejection of Ledbetter's claims related to her transfer to the Final Finish room, to the Technology Engineer position, cannot be squared with its accepting Ledbetter's far-flung theory that her layoff was manufactured by Jones or others to avoid raising her salary. Ledbetter advanced two theories to support her transfer claims: (1) that she was deceived into voluntarily applying for the transfer by Jones's falsely telling her she would be laid off if she stayed in her Area Manager position; and (2) that she was effectively forced her into transferring by, among other things, Jones's constantly (correctly) threatening her with layoff. That the jury rejected these theories suggests that it accepted Goodyear's evidence that Jones did not mistreat Ledbetter, that he correctly told her she would be laid off if she remained an Area Manager, and that he arranged an interview for her for the Technology Engineer position as a gratuitous kindness, in an effort to keep her working until she would be eligible for full retirement. In short, if the jury had

credited Ledbetter's testimony regarding Jones, it almost surely would have found in her favor on one or more of the transfer claims; that it found against her on those claims suggests it did not credit her testimony.

Given Ledbetter's failure to come forward with a scintilla of probative evidence casting doubt on Goodyear's explanation for denying her a raise in 1997, no reasonable factfinder could find that the decision was motivated by Ledbetter's sex.

## IV. Conclusion

In summary, because Goodyear had a system for periodically reviewing employee salaries, Ledbetter could recover on her disparate pay claim only to the extent she proved intentional discrimination in the one decision affecting her pay made within the limitations period created by her EEOC charge, or, at most, the last such decision made immediately preceding the limitations period. Because she failed to carry her burden of coming forward with sufficient evidence to permit a reasonable jury to find that either of those decisions was a pretext for sexual discrimination, the district court should have granted Goodyear judgment as a matter of law. We therefore **reverse** the judgment of the district court and instruct the court to dismiss Ledbetter's complaint with prejudice.

**SO ORDERED**