(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO., INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 05–1074.  Argued November 27, 2006—Decided May 29, 2007

During most of the time that petitioner Ledbetter was employed by respondent Goodyear, salaried employees at the plant where she worked were given or denied raises based on performance evaluations.  Ledbetter submitted a questionnaire to the Equal Employment Opportunity Commission (EEOC) in March 1998 and a formal EEOC charge in July 1998.  After her November 1998 retirement, she filed suit, asserting, among other things, a sex discrimination claim under Title VII of the Civil Rights Act of 1964.  The District Court allowed her Title VII pay discrimination claim to proceed to trial.  There, Ledbetter alleged that several supervisors had in the past given her poor evaluations because of her sex; that as a result, her pay had not increased as much as it would have if she had been evaluated fairly; that those past pay decisions affected the amount of her pay throughout her employment; and that by the end of her employment, she was earning significantly less than her male colleagues.  Goodyear maintained that the evaluations had been nondiscriminatory, but the jury found for Ledbetter, awarding backpay and damages.  On appeal, Goodyear contended that the pay discrimination claim was time barred with regard to all pay decisions made before September 26, 1997—180 days before Ledbetter filed her EEOC questionnaire—and that no discriminatory act relating to her pay occurred after that date.  The Eleventh Circuit reversed, holding that a Title VII pay discrimination claim cannot be based on allegedly discriminatory events that occurred before the last pay decision that affected the employee's pay during the EEOC charging period, and concluding that there was insufficient evidence to prove that Goodyear had acted with discriminatory intent in making the only two pay decisions during that period, denials of raises in 1997 and 1998.

*Held:* Because the later effects of past discrimination do not restart the clock for filing an EEOC charge, Ledbetter's claim is untimely. Pp. 4–24.

(a) An individual wishing to bring a Title VII lawsuit must first file an EEOC charge within, as relevant here, 180 days "after the alleged unlawful employment practice occurred."  42 U. S. C. §2000e–2(a)(1). In addressing the issue of an EEOC charge's timeliness, this Court has stressed the need to identify with care the specific employment practice at issue.  Ledbetter's arguments—that the paychecks that she received during the charging period and the 1998 raise denial each violated Title VII and triggered a new EEOC charging period— fail because they would require the Court in effect to jettison the de- fining element of the disparate-treatment claim on which her Title VII recovery was based, discriminatory intent. *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553, *Delaware State College* v. *Ricks*, 449 U. S. 250, *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900, and *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, clearly in- struct that the EEOC charging period is triggered when a discrete unlawful practice takes place.  A new violation does not occur, and a new charging period does not commence, upon the occurrence of sub- sequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination.  But if an employer engages in a series of separately actionable intentionally discriminatory acts, then a fresh violation takes place when each act is committed.  Ledbetter makes no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions occurring before that period were not communicated to her.  She argues simply that Goodyear's nondiscriminatory conduct during the charging pe- riod gave present effect to discriminatory conduct outside of that pe- riod.  But current effects alone cannot breathe life into prior, un- charged discrimination.  Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory employment de- cision was made and communicated to her.  Her attempt to shift for- ward the intent associated with prior discriminatory acts to the 1998 pay decision is unsound, for it would shift intent away from the act that consummated the discriminatory employment practice to a later act not performed with bias or discriminatory motive, imposing liabil- ity in the absence of the requisite intent.  Her argument would also distort Title VII's "integrated, multistep enforcement procedure." *Oc- cidental Life Ins. Co. of Cal.* v. *EEOC*, 432 U. S. 355, 359.  The short EEOC filing deadline reflects Congress' strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation. *Id.,* at 367–368.  Nothing in Title VII supports treating the intent element of Ledbetter's dispa-

rate-treatment claim any differently from the employment practice element of the claim. Pp. 4–13.

(b) *Bazemore* v. *Friday*, 478 U. S. 385 *(per curiam)*, which concerned a disparate-treatment pay claim, is entirely consistent with *Evans*, *Ricks*, *Lorance*, and *Morgan*. *Bazemore*'s rule is that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues paychecks using a discriminatory pay structure. It is not, as Ledbetter contends, a "paycheck accrual rule" under which each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the complainant may properly challenge any prior discriminatory conduct that impacted that paycheck's amount, no matter how long ago the discrimination occurred. Because Ledbetter has not adduced evidence that Goodyear initially adopted its performance-based pay system in order to discriminate based on sex or that it later applied this system to her within the charging period with discriminatory animus, *Bazemore* is of no help to her. Pp. 13–21.

(c) Ledbetter's "paycheck accrual rule" is also not supported by either analogies to the statutory regimes of the Equal Pay Act of 1963, the Fair Labor Standards Act of 1938, or the National Labor Relations Act, or policy arguments for giving special treatment to pay claims. Pp. 21–24.

421 F. 3d 1169, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–1074

———————

## LILLY M. LEDBETTER, PETITIONER *v.* THE GOOD-YEAR TIRE & RUBBER COMPANY, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[May 29, 2007]

JUSTICE ALITO delivered the opinion of the Court.

This case calls upon us to apply established precedent in a slightly different context. We have previously held that the time for filing a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) begins when the discriminatory act occurs. We have explained that this rule applies to any "[d]iscrete ac[t]" of discrimination, including discrimination in "termination, failure to promote, denial of transfer, [and] refusal to hire." *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 114 (2002). Because a pay-setting decision is a "discrete act," it follows that the period for filing an EEOC charge begins when the act occurs. Petitioner, having abandoned her claim under the Equal Pay Act, asks us to deviate from our prior decisions in order to permit her to assert her claim under Title VII. Petitioner also contends that discrimination in pay is different from other types of employment discrimination and thus should be governed by a different rule. But because a pay-setting decision is a discrete act that occurs at a particular point in time, these arguments must be

rejected. We therefore affirm the judgment of the Court of Appeals.

## I

Petitioner Lilly Ledbetter (Ledbetter) worked for respondent Goodyear Tire and Rubber Company (Goodyear) at its Gadsden, Alabama, plant from 1979 until 1998. During much of this time, salaried employees at the plant were given or denied raises based on their supervisors' evaluation of their performance. In March 1998, Ledbetter submitted a questionnaire to the EEOC alleging certain acts of sex discrimination, and in July of that year she filed a formal EEOC charge. After taking early retirement in November 1998, Ledbetter commenced this action, in which she asserted, among other claims, a Title VII pay discrimination claim and a claim under the Equal Pay Act of 1963 (EPA), 29 U. S. C. §206(d).

The District Court granted summary judgment in favor of Goodyear on several of Ledbetter's claims, including her Equal Pay Act claim, but allowed others, including her Title VII pay discrimination claim, to proceed to trial. In support of this latter claim, Ledbetter introduced evidence that during the course of her employment several supervisors had given her poor evaluations because of her sex, that as a result of these evaluations her pay was not increased as much as it would have been if she had been evaluated fairly, and that these past pay decisions continued to affect the amount of her pay throughout her employment. Toward the end of her time with Goodyear, she was being paid significantly less than any of her male colleagues. Goodyear maintained that the evaluations had been nondiscriminatory, but the jury found for Ledbetter and awarded her backpay and damages.

On appeal, Goodyear contended that Ledbetter's pay discrimination claim was time barred with respect to all pay decisions made prior to September 26, 1997—that is,

180 days before the filing of her EEOC questionnaire.[1] And Goodyear argued that no discriminatory act relating to Ledbetter's pay occurred after that date.

The Court of Appeals for the Eleventh Circuit reversed, holding that a Title VII pay discrimination claim cannot be based on any pay decision that occurred prior to the last pay decision that affected the employee's pay during the EEOC charging period. 421 F. 3d 1169, 1182–1183 (2005). The Court of Appeals then concluded that there was insufficient evidence to prove that Goodyear had acted with discriminatory intent in making the only two pay decisions that occurred within that time span, namely, a decision made in 1997 to deny Ledbetter a raise and a similar decision made in 1998. *Id.*, at 1186–1187.

Ledbetter filed a petition for a writ of certiorari but did not seek review of the Court of Appeals' holdings regarding the sufficiency of the evidence in relation to the 1997 and 1998 pay decisions. Rather, she sought review of the following question:

> "Whether and under what circumstances a plaintiff may bring an action under Title VII of the Civil Rights Act of 1964 alleging illegal pay discrimination when the disparate pay is received during the statutory limitations period, but is the result of intentionally discriminatory pay decisions that occurred outside the limitations period." Pet. for Cert. i.

In light of disagreement among the Courts of Appeals as to the proper application of the limitations period in Title VII disparate-treatment pay cases, compare 421 F. 3d

---

[1] The parties assume that the EEOC charging period runs backwards from the date of the questionnaire, even though Ledbetter's discriminatory pay claim was not added until the July 1998 formal charge. 421 F. 3d 1169, 1178 (CA11 2005). We likewise assume for the sake of argument that the filing of the questionnaire, rather than the formal charge, is the appropriate date.

1169, with *Forsyth* v. *Federation Employment & Guidance Serv.*, 409 F. 3d 565 (CA2 2005); *Shea* v. *Rice*, 409 F. 3d 448 (CADC 2005), we granted certiorari, 548 U. S. ___ (2006).

## II

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to discriminate "against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U. S. C. §2000e–2(a)(1). An individual wishing to challenge an employment practice under this provision must first file a charge with the EEOC. §2000e–5(e)(1). Such a charge must be filed within a specified period (either 180 or 300 days, depending on the State) "after the alleged unlawful employment practice occurred," *ibid.*, and if the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court, §2000e–5(f)(1).

In addressing the issue whether an EEOC charge was filed on time, we have stressed the need to identify with care the specific employment practice that is at issue. *Morgan*, 536 U. S., at 110–111. Ledbetter points to two different employment practices as possible candidates. Primarily, she urges us to focus on the paychecks that were issued to her during the EEOC charging period (the 180-day period preceding the filing of her EEOC questionnaire), each of which, she contends, was a separate act of discrimination. Alternatively, Ledbetter directs us to the 1998 decision denying her a raise, and she argues that this decision was "unlawful because it carried forward intentionally discriminatory disparities from prior years." Reply Brief for Petitioner 20. Both of these arguments fail because they would require us in effect to jettison the defining element of the legal claim on which her Title VII recovery was based.

Ledbetter asserted disparate treatment, the central

element of which is discriminatory intent. See *Chardon* v. *Fernandez*, 454 U. S. 6, 8 (1981) *(per curiam); Teamsters* v. *United States*, 431 U. S. 324, 335, n. 15 (1977); *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 1002 (1998) (Blackmun, J., joined by Brennan, and Marshall, JJ., concurring in part and concurring in judgment) ("[A] disparate-treatment challenge focuses exclusively on the intent of the employer"). However, Ledbetter does not assert that the relevant Goodyear decisionmakers acted with actual discriminatory intent either when they issued her checks during the EEOC charging period or when they denied her a raise in 1998. Rather, she argues that the paychecks were unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner *prior to* the EEOC charging period. Brief for Petitioner 22. Similarly, she maintains that the 1998 decision was unlawful because it "carried forward" the effects of prior, uncharged discrimination decisions. Reply Brief for Petitioner 20. In essence, she suggests that it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period. Brief for Petitioner 13 ("[E]ach paycheck that offers a woman less pay than a similarly situated man because of her sex is a separate violation of Title VII with its own limitations period, regardless of whether the paycheck simply implements a prior discriminatory decision made outside the limitations period"); see also Reply Brief for Petitioner 20. This argument is squarely foreclosed by our precedents.

In *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977), we rejected an argument that is basically the same as Ledbetter's. Evans was forced to resign because the airline refused to employ married flight attendants, but she did not file an EEOC charge regarding her termination. Some years later, the airline rehired her but treated her as a new employee for seniority purposes. *Id.*, at 554–555.

Evans then sued, arguing that, while any suit based on the original discrimination was time barred, the airline's refusal to give her credit for her prior service gave "present effect to [its] past illegal act and thereby perpetuate[d] the consequences of forbidden discrimination." *Id.*, at 557.

We agreed with Evans that the airline's "seniority system [did] indeed have a continuing impact on her pay and fringe benefits," *id.,* at 558, but we noted that "the critical question [was] whether any present *violation* exist[ed]." *Ibid.* (emphasis in original). We concluded that the continuing effects of the precharging period discrimination did not make out a present violation. As JUSTICE STEVENS wrote for the Court:

> "United was entitled to treat [Evans' termination] as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by §706(d). A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences." *Ibid.*

It would be difficult to speak to the point more directly.

Equally instructive is *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980), which concerned a college librarian, Ricks, who alleged that he had been discharged because of race. In March 1974, Ricks was denied tenure, but he was given a final, nonrenewable one-year contract that expired on June 30, 1975. *Id.*, at 252–253. Ricks delayed filing a charge with the EEOC until April 1975, *id.*, at 254, but he argued that the EEOC charging period ran from the date of his actual termination rather than from the date when tenure was denied. In rejecting this argument, we recognized that "one of the *effects* of the denial of tenure," namely, his ultimate termination, "did not occur until later." *Id.,* at 258 (emphasis in original). But because

Ricks failed to identify any specific discriminatory act "that continued until, or occurred at the time of, the actual termination of his employment," *id.*, at 257, we held that the EEOC charging period ran from "the time the tenure decision was made and communicated to Ricks," *id.*, at 258.

This same approach dictated the outcome in *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989), which grew out of a change in the way in which seniority was calculated under a collective-bargaining agreement. Before 1979, all employees at the plant in question accrued seniority based simply on years of employment at the plant. In 1979, a new agreement made seniority for workers in the more highly paid (and traditionally male) position of "tester" depend on time spent in that position alone and not in other positions in the plant. Several years later, when female testers were laid off due to low seniority as calculated under the new provision, they filed an EEOC charge alleging that the 1979 scheme had been adopted with discriminatory intent, namely, to protect incumbent male testers when women with substantial plant seniority began to move into the traditionally male tester positions. *Id.*, at 902–903.

We held that the plaintiffs' EEOC charge was not timely because it was not filed within the specified period after the adoption in 1979 of the new seniority rule. We noted that the plaintiffs had not alleged that the new seniority rule treated men and women differently or that the rule had been applied in a discriminatory manner. Rather, their complaint was that the rule was adopted originally with discriminatory intent. *Id.*, at 905. And as in *Evans* and *Ricks*, we held that the EEOC charging period ran from the time when the discrete act of alleged intentional discrimination occurred, not from the date when the effects of this practice were felt. 490 U. S., at 907–908. We stated:

"Because the claimed invalidity of the facially nondiscriminatory and neutrally applied tester seniority system is wholly dependent on the alleged illegality of signing the underlying agreement, it is the date of that signing which governs the limitations period." *Id.*, at 911.[2]

Our most recent decision in this area confirms this understanding. In *Morgan*, we explained that the statutory term "employment practice" generally refers to "a discrete act or single 'occurrence'" that takes place at a particular point in time. 536 U. S., at 110–111. We pointed to "termination, failure to promote, denial of transfer, [and] refusal to hire" as examples of such "discrete" acts, and we held that a Title VII plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.*, at 114.

The instruction provided by *Evans*, *Ricks*, *Lorance*, and *Morgan* is clear. The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does

---

[2] After *Lorance*, Congress amended Title VII to cover the specific situation involved in that case. See 42 U. S. C. §2000e–5(e)(2) (allowing for Title VII liability arising from an intentionally discriminatory seniority system both at the time of its adoption and at the time of its application). The dissent attaches great significance to this amendment, suggesting that it shows that *Lorance* was wrongly reasoned as an initial matter. *Post*, at 10–12 (opinion of GINSBURG, J.). However, the very legislative history cited by the dissent explains that this amendment and the other 1991 Title VII amendments "'*expand[ed]* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.'" *Post*, at 11 (emphasis added). For present purposes, what is most important about the amendment in question is that it applied only to the adoption of a discriminatory seniority system, not to other types of employment discrimination. *Evans* and *Ricks*, upon which *Lorance* relied, 490 U. S., at 906–908, and which employed identical reasoning, were left in place, and these decisions are more than sufficient to support our holding today.

not commence, upon the occurrence of subsequent non-discriminatory acts that entail adverse effects resulting from the past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed. See *Morgan*, *supra*, at 113.

Ledbetter's arguments here—that the paychecks that she received during the charging period and the 1998 raise denial each violated Title VII and triggered a new EEOC charging period—cannot be reconciled with *Evans*, *Ricks*, *Lorance*, and *Morgan*. Ledbetter, as noted, makes no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions that occurred prior to that period were not communicated to her. Instead, she argues simply that Goodyear's conduct during the charging period gave present effect to discriminatory conduct outside of that period. Brief for Petitioner 13. But current effects alone cannot breathe life into prior, uncharged discrimination; as we held in *Evans*, such effects in themselves have "no present legal consequences." 431 U. S., at 558. Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory pay decision was made and communicated to her. She did not do so, and the paychecks that were issued to her during the 180 days prior to the filing of her EEOC charge do not provide a basis for overcoming that prior failure.

In an effort to circumvent the need to prove discriminatory intent during the charging period, Ledbetter relies on the intent associated with other decisions made by other persons at other times. Reply Brief for Petitioner 6 ("Intentional discrimination . . . occurs when . . . differential treatment takes place, even if the intent to engage in that conduct for a discriminatory purpose was made previously").

Ledbetter's attempt to take the intent associated with the prior pay decisions and shift it to the 1998 pay deci-

sion is unsound.  It would shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive.  The effect of this shift would be to impose liability in the absence of the requisite intent.

Our cases recognize this point.  In *Evans*, for example, we did not take the airline's discriminatory intent in 1968, when it discharged the plaintiff because of her sex, and attach that intent to its later act of neutrally applying its seniority rules.  Similarly, in *Ricks*, we did not take the discriminatory intent that the college allegedly possessed when it denied Ricks tenure and attach that intent to its subsequent act of terminating his employment when his nonrenewable contract ran out.  On the contrary, we held that "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks."  449 U. S., at 258.

Not only would Ledbetter's argument effectively eliminate the defining element of her disparate-treatment claim, but it would distort Title VII's "integrated, multistep enforcement procedure."  *Occidental Life Ins. Co. of Cal.* v. *EEOC*, 432 U. S. 355, 359 (1977).  We have previously noted the legislative compromises that preceded the enactment of Title VII, *Mohasco Corp.* v. *Silver*, 447 U. S. 807, 819–821 (1980); *EEOC* v. *Commercial Office Products Co.*, 486 U. S. 107, 126 (1988) (STEVENS, J., joined by Rehnquist, C. J., and SCALIA, J., dissenting).  Respectful of the legislative process that crafted this scheme, we must "give effect to the statute as enacted," *Mohasco, supra,* at 819, and we have repeatedly rejected suggestions that we extend or truncate Congress' deadlines.  See, *e.g.*, *Electrical Workers* v. *Robbins & Myers, Inc.*, 429 U. S. 229, 236–240 (1976) (union grievance procedures do not toll EEOC filing deadline); *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 47–49 (1974) (arbitral

decisions do not foreclose access to court following a timely filed EEOC complaint).

Statutes of limitations serve a policy of repose. *American Pipe & Constr. Co.* v. *Utah*, 414 U. S. 538, 554–555 (1974). They

> "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States* v. *Kubrick*, 444 U. S. 111, 117 (1979) (quoting *Railroad Telegraphers* v. *Railway Express Agency, Inc.*, 321 U. S. 342, 349 (1944)).

The EEOC filing deadline "protect[s] employers from the burden of defending claims arising from employment decisions that are long past." *Ricks, supra,* at 256–257. Certainly, the 180-day EEOC charging deadline, 42 U. S. C. §2000e–5(e)(1), is short by any measure, but "[b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Mohasco, supra,* at 825. This short deadline reflects Congress' strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation. *Occidental Life Ins., supra,* at 367–368; *Alexander, supra,* at 44.

A disparate-treatment claim comprises two elements: an employment practice, and discriminatory intent. Nothing in Title VII supports treating the intent element of Ledbetter's claim any differently from the employment practice element.[3] If anything, concerns regarding stale

_____

[3] Of course, there may be instances where the elements forming a cause of action span more than 180 days. Say, for instance, an employer forms an illegal discriminatory intent towards an employee but does not act on it until 181 days later. The charging period would not

claims weigh more heavily with respect to proof of the intent associated with employment practices than with the practices themselves. For example, in a case such as this in which the plaintiff's claim concerns the denial of raises, the employer's challenged acts (the decisions not to increase the employee's pay at the times in question) will almost always be documented and will typically not even be in dispute. By contrast, the employer's intent is almost always disputed, and evidence relating to intent may fade quickly with time. In most disparate-treatment cases, much if not all of the evidence of intent is circumstantial. Thus, the critical issue in a case involving a long-past performance evaluation will often be whether the evaluation was so far off the mark that a sufficient inference of discriminatory intent can be drawn. See *Watson*, 487 U. S., at 1004 (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in judgment) (noting that in a disparate-treatment claim, the *McDonnell Douglas* factors establish discrimination by inference). See also, *e.g.*, *Zhuang* v. *Datacard Corp.*, 414 F. 3d 849 (CA8 2005) (rejecting inference of discrimination from performance evaluations); *Cooper* v. *Southern Co.*, 390 F. 3d 695, 732–733 (CA11 2004) (same). This can be a subtle determination, and the passage of time may seriously diminish the ability of the parties and the factfinder to reconstruct what actually happened.[4]

_____

begin to run until the employment practice was executed on day 181 because until that point the employee had no cause of action. The act and intent had not yet been joined. Here, by contrast, Ledbetter's cause of action was fully formed and present at the time that the discriminatory employment actions were taken against her, at which point she could have, and should have, sued.

[4] The dissent dismisses this concern, *post*, at 15–16, but this case illustrates the problems created by tardy lawsuits. Ledbetter's claims of sex discrimination turned principally on the misconduct of a single Goodyear supervisor, who, Ledbetter testified, retaliated against her when she rejected his sexual advances during the early 1980's, and did

Ledbetter contends that employers would be protected by the equitable doctrine of laches, but Congress plainly did not think that laches was sufficient in this context. Indeed, Congress took a diametrically different approach, including in Title VII a provision allowing only a few months in most cases to file a charge with the EEOC. 42 U. S. C. §2000e–5(e)(1).

Ultimately, "experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Mohasco,* 447 U. S., at 826. By operation of §§2000e–5(e)(1) and 2000e–5(f)(1), a Title VII "claim is time barred if it is not filed within these time limits." *Morgan*, 536 U. S., at 109; *Electrical Workers,* 429 U. S., at 236. We therefore reject the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period. Ledbetter's claim is, for this reason, untimely.

## III
### A

In advancing her two theories Ledbetter does not seriously contest the logic of *Evans*, *Ricks*, *Lorance*, and *Morgan* as set out above, but rather argues that our decision in *Bazemore* v. *Friday*, 478 U. S. 385 (1986) *(per curiam)*, requires different treatment of her claim because it relates to pay. Ledbetter focuses specifically on our statement

––––––––––

so again in the mid-1990's when he falsified deficiency reports about her work. His misconduct, Ledbetter argues, was "a principal basis for [her] performance evaluation in 1997." Brief for Petitioner 6; see also *id.*, at 5–6, 8, 11 (stressing the same supervisor's misconduct). Yet, by the time of trial, this supervisor had died and therefore could not testify. A timely charge might have permitted his evidence to be weighed contemporaneously.

that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII." *Id.*, at 395. She argues that in *Bazemore* we adopted a "paycheck accrual rule" under which each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the complainant may properly challenge any prior discriminatory conduct that impacted the amount of that paycheck, no matter how long ago the discrimination occurred. On this reading, *Bazemore* dispensed with the need to prove actual discriminatory intent in pay cases and, without giving any hint that it was doing so, repudiated the very different approach taken previously in *Evans* and *Ricks*. Ledbetter's interpretation is unsound.

*Bazemore* concerned a disparate-treatment pay claim brought against the North Carolina Agricultural Extension Service (Service). 478 U. S., at 389–390. Service employees were originally segregated into "a white branch" and "a 'Negro branch,'" with the latter receiving less pay, but in 1965 the two branches were merged. *Id.*, at 390–391. After Title VII was extended to public employees in 1972, black employees brought suit claiming that pay disparities attributable to the old dual pay scale persisted. *Id.*, at 391. The Court of Appeals rejected this claim, which it interpreted to be that the "'discriminatory difference in salaries should have been affirmatively eliminated.'" *Id.,* at 395.

This Court reversed in a *per curiam* opinion, 478 U. S., at 386–388, but all of the Members of the Court joined Justice Brennan's separate opinion, see *id.,* at 388 (opinion concurring in part). Justice Brennan wrote:

> "The error of the Court of Appeals with respect to salary disparities created prior to 1972 and perpetuated thereafter is too obvious to warrant extended discussion: that the Extension Service discriminated with

respect to salaries *prior* to the time it was covered by Title VII does not excuse perpetuating that discrimination *after* the Extension Service became covered by Title VII. To hold otherwise would have the effect of exempting from liability those employers who were historically the greatest offenders of the rights of blacks. A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute. While recovery may not be permitted for pre-1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed." *Id.*, at 395 (emphasis in original).

Far from adopting the approach that Ledbetter advances here, this passage made a point that was "too obvious to warrant extended discussion," *ibid.;* namely, that when an employer adopts a facially discriminatory pay structure that puts some employees on a lower scale because of race, the employer engages in intentional discrimination whenever it issues a check to one of these disfavored employees. An employer that adopts and intentionally retains such a pay structure can surely be regarded as intending to discriminate on the basis of race as long as the structure is used.

*Bazemore* thus is entirely consistent with our prior precedents, as Justice Brennan's opinion took care to point out. Noting that *Evans* turned on whether "'any *present violation* exist[ed],'" Justice Brennan stated that the *Bazemore* plaintiffs were alleging that the defendants "ha[d] not from the date of the Act forward made all their employment decisions in a wholly nondiscriminatory way," 478 U. S., at 396–397, n. 6 (emphasis in original; internal

quotation marks and brackets omitted)–which is to say that they had engaged in fresh discrimination. Justice Brennan added that the Court's "holding in no sense g[ave] legal effect to the pre-1972 actions, but, consistent with *Evans* . . . focuse[d] on the present salary structure, which is illegal if it *is a mere continuation of the pre-1965 discriminatory pay structure.*" *Id.,* at 397, n. 6 (emphasis added).

The sentence in Justice Brennan's opinion on which Ledbetter chiefly relies comes directly after the passage quoted above, and makes a similarly obvious point:

> "Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Id.*, at 395.[5]

---

[5] That the focus in *Bazemore* was on a current violation, not the carrying forward of a past act of discrimination, was made clearly by the side opinion in the Court of Appeals:

"[T]he majority holds, in effect, that because the pattern of discriminatory salaries here challenged originated before applicable provisions of the Civil Rights Act made their payment illegal, any 'lingering effects' of that earlier pattern cannot (presumably on an indefinitely maintained basis) be considered in assessing a challenge to post-act continuation of that pattern.

"*Hazelwood* and *Evans* indeed made it clear that an employer cannot be found liable, or sanctioned with remedy, for employment decisions made before they were declared illegal or as to which the claimant has lost any right of action by lapse of time. For this reason it is generally true that, as the catch-phrase has it, Title VII imposed 'no obligation to catch-up,' i.e., affirmatively to remedy present effects of pre-Act discrimination, whether in composing a work force or otherwise. But those cases cannot be thought to insulate employment decisions that presently are illegal on the basis that at one time *comparable* decisions were legal when made by the particular employer. It is therefore one thing to say that an employer who upon the effective date of Title VII finds itself with a racially unbalanced work-force need not act affirmatively to redress the balance; and quite another to say that it may also

In other words, a freestanding violation may always be charged within its own charging period regardless of its connection to other violations. We repeated this same point more recently in *Morgan:* "The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." 536 U. S., at 113.[6] Neither of these opinions stands for the proposition that an action not comprising an employment practice and alleged discriminatory intent is separately chargeable, just because it is related to some past act of discrimination.

Ledbetter attempts to eliminate the obvious inconsistencies between her interpretation of *Bazemore* and the *Evans/Ricks/Lorance/Morgan* line of cases on the ground that none of the latter cases involved pay raises, but the logic of our prior cases is fully applicable to pay cases. To take *Evans* as an example, the employee there was unlawfully terminated; this caused her to lose seniority; and the loss of seniority affected her wages, among other things. 431 U. S., at 555, n. 5 ("[S]eniority determine[s] a flight

―――――――――

continue to make discriminatory hiring decisions because it was by that means that its present work force was composed. It may not, in short, under the *Hazelwood/Evans* principle continue practices now violative simply because at one time they were not." *Bazemore* v. *Friday,* 751 F. 2d 662, 695–696 (CA4 1984) (Phillips, J., concurring in part and dissenting in part) (emphasis in original; footnotes omitted).

[6]The briefs filed with this Court in *Bazemore* v. *Friday,* 478 U. S. 385 (1986) *(per curiam),* further elucidate the point. The petitioners described the Service's conduct as "[t]he continued use of a racially explicit base wage." Brief for Petitioner Bazemore et al. in *Bazemore* v. *Friday,* O. T. 1985, No. 85–93, p. 33. The United States' brief also properly distinguished the commission of a discrete discriminatory act with continuing adverse results from the intentional carrying forward of a discriminatory pay system. Brief for Federal Petitioners in *Bazemore* v. *Friday,* O. T. 1984, Nos. 85–93 and 85–428, p. 17. This case involves the former, not the latter.

attendant's wages; the duration and timing of vacations; rights to retention in the event of layoffs and rights to re-employment thereafter; and rights to preferential selection of flight assignments"). The relationship between past discrimination and adverse present effects was the same in *Evans* as it is here. Thus, the argument that Ledbetter urges us to accept here would necessarily have commanded a different outcome in *Evans*.

*Bazemore* stands for the proposition that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues paychecks using a discriminatory pay structure. But a new Title VII violation does not occur and a new charging period is not triggered when an employer issues paychecks pursuant to a system that is "facially nondiscriminatory and neutrally applied." *Lorance*, 490 U. S., at 911. The fact that pre-charging period discrimination adversely affects the calculation of a neutral factor (like seniority) that is used in determining future pay does not mean that each new paycheck constitutes a new violation and restarts the EEOC charging period.

Because Ledbetter has not adduced evidence that Goodyear initially adopted its performance-based pay system in order to discriminate on the basis of sex or that it later applied this system to her within the charging period with any discriminatory animus, *Bazemore* is of no help to her. Rather, all Ledbetter has alleged is that Goodyear's agents discriminated against her individually in the past and that this discrimination reduced the amount of later pay-checks. Because Ledbetter did not file timely EEOC charges relating to her employer's discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time.

B

The dissent also argues that pay claims are different.

Its principal argument is that a pay discrimination claim is like a hostile work environment claim because both types of claims are "'based on the cumulative effect of individual acts,'" *post*, at 6–7, but this analogy overlooks the critical conceptual distinction between these two types of claims. And although the dissent relies heavily on *Morgan*, the dissent's argument is fundamentally inconsistent with *Morgan*'s reasoning.

*Morgan* distinguished between "discrete" acts of discrimination and a hostile work environment. A discrete act of discrimination is an act that in itself "constitutes a separate actionable 'unlawful employment practice'" and that is temporally distinct. *Morgan*, 536 U. S., at 114, 117. As examples we identified "termination, failure to promote, denial of transfer, or refusal to hire." *Id.*, at 114. A hostile work environment, on the other hand, typically comprises a succession of harassing acts, each of which "may not be actionable on its own." In addition, a hostile work environment claim "cannot be said to occur on any particular day." *Id.*, at 115–116. In other words, the actionable wrong is the environment, not the individual acts that, taken together, create the environment.[7]

Contrary to the dissent's assertion, *post*, at 6–7, what Ledbetter alleged was not a single wrong consisting of a succession of acts. Instead, she alleged a series of discrete discriminatory acts, see Brief for Petitioner 13, 15 (arguing that payment of each paycheck constituted a separate

_____

[7] Moreover, the proposed hostile salary environment claim would go far beyond *Morgan*'s limits. *Morgan* still required at least some of the discriminatorily-motivated acts predicate to a hostile work environment claim to occur within the charging period. 536 U. S., at 117 ("Provided that *an act contributing to the claim occurs within the filing period*, the entire time period of the hostile environment may be considered by a court" (emphasis added)). But the dissent would permit claims where no one acted in any way with an improper motive during the charging period. *Post*, at 7, 16.

violation of Title VII), each of which *was* independently identifiable and actionable, and *Morgan* is perfectly clear that when an employee alleges "serial violations," *i.e.*, a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation. 536 U. S., at 113.

While this fundamental misinterpretation of *Morgan* is alone sufficient to show that the dissent's approach must be rejected, it should also be noted that the dissent is coy as to whether it would apply the same rule to all pay discrimination claims or whether it would limit the rule to cases like Ledbetter's, in which multiple discriminatory pay decisions are alleged. The dissent relies on the fact that Ledbetter was allegedly subjected to a series of discriminatory pay decisions over a period of time, and the dissent suggests that she did not realize for some time that she had been victimized. But not all pay cases share these characteristics.

If, as seems likely, the dissent would apply the same rule in all pay cases, then, if a single discriminatory pay decision made 20 years ago continued to affect an employee's pay today, the dissent would presumably hold that the employee could file a timely EEOC charge today. And the dissent would presumably allow this even if the employee had full knowledge of all the circumstances relating to the 20-year-old decision at the time it was made.[8] The dissent, it appears, proposes that we adopt a special rule for pay cases based on the particular charac-

_____

[8] The dissent admits as much, responding only that an employer could resort to equitable doctrines such as laches. *Post*, at 16. But first, as we have noted, Congress has already determined that defense to be insufficient. *Supra*, at 13. Second, it is far from clear that a suit filed under the dissent's theory, alleging that a paycheck paid recently within the charging period was itself a freestanding violation of Title VII because it reflected the effects of 20-year-old discrimination, would even be barred by laches.

teristics of one case that is certainly not representative of all pay cases and may not even be typical. We refuse to take that approach.

## IV

In addition to the arguments previously discussed, Ledbetter relies largely on analogies to other statutory regimes and on extrastatutory policy arguments to support her "paycheck accrual rule."

## A

Ledbetter places significant weight on the EPA, which was enacted contemporaneously with Title VII and prohibits paying unequal wages for equal work because of sex. 29 U. S. C. §206(d). Stating that "the lower courts routinely hear [EPA] claims challenging pay disparities that first arose outside the limitations period," Ledbetter suggests that we should hold that Title VII is violated each time an employee receives a paycheck that reflects past discrimination. Brief for Petitioner 34–35.

The simple answer to this argument is that the EPA and Title VII are not the same. In particular, the EPA does not require the filing of a charge with the EEOC or proof of intentional discrimination. See §206(d)(1) (asking only whether the alleged inequality resulted from "any other factor other than sex"). Ledbetter originally asserted an EPA claim, but that claim was dismissed by the District Court and is not before us. If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts.[9]

——————

[9] The Magistrate Judge recommended dismissal of Ledbetter's EPA claim on the ground that Goodyear had demonstrated that the pay disparity resulted from Ledbetter's consistently weak performance, not her sex. App. to Pet. for Cert. 71a–77a. The Magistrate Judge also recommended dismissing the Title VII disparate-pay claim on the same basis. *Id.*, at 65a–69a. Ledbetter objected to the Magistrate Judge's disposition of the Title VII and EPA claims, arguing that the Magis-

Ledbetter's appeal to the Fair Labor Standards Act of 1938 (FLSA) is equally unavailing. Stating that it is "well established that the statute of limitations for violations of the minimum wage and overtime provisions of the [FLSA] runs anew with each paycheck," Brief for Petitioner 35, Ledbetter urges that the same should be true in a Title VII pay case. Again, however, Ledbetter's argument overlooks the fact that an FLSA minimum wage or overtime claim does not require proof of a specific intent to discriminate. See 29 U. S. C. §207 (establishing overtime rules); cf. §255(a) (establishing 2-year statute of limitations for FLSA claims, except for claims of a "willful violation," which may be commenced within 3 years).

Ledbetter is on firmer ground in suggesting that we look to cases arising under the National Labor Relations Act (NLRA) since the NLRA provided a model for Title VII's remedial provisions and, like Title VII, requires the filing of a timely administrative charge (with the National Labor Relations Board) before suit may be maintained. *Lorance,* 490 U. S., at 909; *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 226, n. 8 (1982). Cf. 29 U. S. C. §160(b) ("[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board").

Ledbetter argues that the NLRA's 6-month statute of limitations begins anew for each paycheck reflecting a prior violation of the statute, but our precedents suggest

trate Judge had improperly resolved a disputed factual issue. See Plaintiff's Objections to Magistrate Judge's Report and Recommendation, 1 Record in No. 03–15246–G (CA11), Doc. 32. The District Court sustained this objection as to the "disparate pay" claim, but without specifically mentioning the EPA claim, which had been dismissed by the Magistrate Judge on the same basis. See App. to Pet. for Cert. 43a–44a. While the record is not entirely clear, it appears that at this point Ledbetter elected to abandon her EPA claim, proceeding to trial with only the Title VII disparate-pay claim, thus giving rise to the dispute the Court must now resolve.

otherwise. In *Machinists* v. *NLRB*, 362 U. S. 411, 416–417 (1960), we held that "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice[,] the use of the earlier unfair labor practice [merely] serves to cloak with illegality that which was otherwise lawful." This interpretation corresponds closely to our analysis in *Evans* and *Ricks* and supports our holding in the present case.

### B

Ledbetter, finally, makes a variety of policy arguments in favor of giving the alleged victims of pay discrimination more time before they are required to file a charge with the EEOC. Among other things, she claims that pay discrimination is harder to detect than other forms of employment discrimination.[10]

We are not in a position to evaluate Ledbetter's policy arguments, and it is not our prerogative to change the way in which Title VII balances the interests of aggrieved employees against the interest in encouraging the "prompt processing of all charges of employment discrimination," *Mohasco*, 447 U. S., at 825, and the interest in repose.

Ledbetter's policy arguments for giving special treatment to pay claims find no support in the statute and are inconsistent with our precedents.[11] We apply the statute

_____

[10] We have previously declined to address whether Title VII suits are amenable to a discovery rule. *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 114, n. 7 (2002). Because Ledbetter does not argue that such a rule would change the outcome in her case, we have no occasion to address this issue.

[11] Ledbetter argues that the EEOC's endorsement of her approach in its Compliance Manual and in administrative adjudications merits deference. But we have previously declined to extend *Chevron* deference to the Compliance Manual, *Morgan, supra*, at 111, n. 6, and similarly decline to defer to the EEOC's adjudicatory positions. The EEOC's views in question are based on its misreading of *Bazemore*.

as written, and this means that any unlawful employment practice, including those involving compensation, must be presented to the EEOC within the period prescribed by statute.

*      *      *

For these reasons, the judgment of the Court of Appeals for the Eleventh Circuit is affirmed.

*It is so ordered.*

———————

See, *e.g.*, *Amft* v. *Mineta*, No. 07A40116, 2006 WL 985183, **\*5** (EEOC Office of Fed. Operations, Apr. 6, 2006); *Albritton* v. *Postmaster General*, No. 01A44063, 2004 WL 2983682, **\*2** (EEOC Office of Fed. Operations, Dec. 17, 2004). Agencies have no special claim to deference in their interpretation of our decisions. *Reno* v. *Bossier Parish School Bd.*, 528 U. S. 320, 336, n. 5 (2000). Nor do we see reasonable ambiguity in the statute itself, which makes no distinction between compensation and other sorts of claims and which clearly requires that discrete employment actions alleged to be unlawful be motivated "because of such individual's . . . sex." 42 U. S. C. §2000e–a(a)(1).

# SUPREME COURT OF THE UNITED STATES

No. 05–1074

LILLY M. LEDBETTER, PETITIONER *v.* THE GOOD-
YEAR TIRE & RUBBER COMPANY, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[May 29, 2007]

JUSTICE GINSBURG, with whom JUSTICE STEVENS,
JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

Lilly Ledbetter was a supervisor at Goodyear Tire and
Rubber's plant in Gadsden, Alabama, from 1979 until her
retirement in 1998. For most of those years, she worked
as an area manager, a position largely occupied by men.
Initially, Ledbetter's salary was in line with the salaries of
men performing substantially similar work. Over time,
however, her pay slipped in comparison to the pay of male
area managers with equal or less seniority. By the end of
1997, Ledbetter was the only woman working as an area
manager and the pay discrepancy between Ledbetter and
her 15 male counterparts was stark: Ledbetter was paid
$3,727 per month; the lowest paid male area manager
received $4,286 per month, the highest paid, $5,236. See
421 F. 3d 1169, 1174 (CA11 2005); Brief for Petitioner 4.

Ledbetter launched charges of discrimination before the
Equal Employment Opportunity Commission (EEOC) in
March 1998. Her formal administrative complaint speci-
fied that, in violation of Title VII, Goodyear paid her a
discriminatorily low salary because of her sex. See 42
U. S. C. §2000e–2(a)(1) (rendering it unlawful for an em-
ployer "to discriminate against any individual with respect
to [her] compensation . . . because of such individual's . . .
sex"). That charge was eventually tried to a jury, which

found it "more likely than not that [Goodyear] paid [Ledbetter] a[n] unequal salary because of her sex." App. 102. In accord with the jury's liability determination, the District Court entered judgment for Ledbetter for backpay and damages, plus counsel fees and costs.

The Court of Appeals for the Eleventh Circuit reversed. Relying on Goodyear's system of annual merit-based raises, the court held that Ledbetter's claim, in relevant part, was time barred. 421 F. 3d, at 1171, 1182–1183. Title VII provides that a charge of discrimination "shall be filed within [180] days after the alleged unlawful employment practice occurred." 42 U. S. C. §2000e–5(e)(1).[1] Ledbetter charged, and proved at trial, that within the 180-day period, her pay was substantially less than the pay of men doing the same work. Further, she introduced evidence sufficient to establish that discrimination against female managers at the Gadsden plant, not performance inadequacies on her part, accounted for the pay differential. See, *e.g.*, App. 36–47, 51–68, 82–87, 90–98, 112–113. That evidence was unavailing, the Eleventh Circuit held, and the Court today agrees, because it was incumbent on Ledbetter to file charges year-by-year, each time Goodyear failed to increase her salary commensurate with the salaries of male peers. Any annual pay decision not contested immediately (within 180 days), the Court affirms, becomes grandfathered, a *fait accompli* beyond the province of Title VII ever to repair.

The Court's insistence on immediate contest overlooks common characteristics of pay discrimination. Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is

—————

[1] If the complainant has first instituted proceedings with a state or local agency, the filing period is extended to 300 days or 30 days after the denial of relief by the agency. 42 U. S. C. §2000e–5(e)(1). Because the 180-day period applies to Ledbetter's case, that figure will be used throughout. See *ante*, at 3, 4.

at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves.

Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, . . . or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory. See *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 114 (2002). It is only when the disparity becomes apparent and sizable, *e.g.*, through future raises calculated as a percentage of current salaries, that an employee in Ledbetter's situation is likely to comprehend her plight and, therefore, to complain. Her initial readiness to give her employer the benefit of the doubt should not preclude her from later challenging the then current and continuing payment of a wage depressed on account of her sex.

On questions of time under Title VII, we have identified as the critical inquiries: "What constitutes an 'unlawful employment practice' and when has that practice 'occurred'?" *Id.,* at 110. Our precedent suggests, and lower courts have overwhelmingly held, that the unlawful practice is the *current payment* of salaries infected by gender-based (or race-based) discrimination—a practice that occurs whenever a paycheck delivers less to a woman than to a similarly situated man. See *Bazemore* v. *Friday*, 478 U. S. 385, 395 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part).

## I

Title VII proscribes as an "unlawful employment prac-

tice" discrimination "against any individual with respect to his compensation . . . because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a)(1). An individual seeking to challenge an employment practice under this proscription must file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." §2000e–5(e)(1). See *ante*, at 4; *supra*, at 2, n. 1.

Ledbetter's petition presents a question important to the sound application of Title VII: What activity qualifies as an unlawful employment practice in cases of discrimination with respect to compensation. One answer identifies the pay-setting decision, and that decision alone, as the unlawful practice. Under this view, each particular salary-setting decision is discrete from prior and subsequent decisions, and must be challenged within 180 days on pain of forfeiture. Another response counts both the pay-setting decision and the actual payment of a discriminatory wage as unlawful practices. Under this approach, each payment of a wage or salary infected by sex-based discrimination constitutes an unlawful employment practice; prior decisions, outside the 180-day charge-filing period, are not themselves actionable, but they are relevant in determining the lawfulness of conduct within the period. The Court adopts the first view, see *ante*, at 1, 4, 9, but the second is more faithful to precedent, more in tune with the realities of the workplace, and more respectful of Title VII's remedial purpose.

### A

In *Bazemore*, we unanimously held that an employer, the North Carolina Agricultural Extension Service, committed an unlawful employment practice each time it paid black employees less than similarly situated white employees. 478 U. S., at 395 (opinion of Brennan, J.). Before 1965, the Extension Service was divided into two

branches: a white branch and a "Negro branch." *Id.*, at 390. Employees in the "Negro branch" were paid less than their white counterparts. In response to the Civil Rights Act of 1964, which included Title VII, the State merged the two branches into a single organization, made adjustments to reduce the salary disparity, and began giving annual raises based on nondiscriminatory factors. *Id.*, at 390–391, 394–395. Nonetheless, "some pre-existing salary disparities continued to linger on." *Id.*, at 394 (internal quotation marks omitted). We rejected the Court of Appeals' conclusion that the plaintiffs could not prevail because the lingering disparities were simply a continuing effect of a decision lawfully made prior to the effective date of Title VII. See *id.*, at 395–396. Rather, we reasoned, "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII." *Id.*, at 395. Paychecks perpetuating past discrimination, we thus recognized, are actionable not simply because they are "related" to a decision made outside the charge-filing period, cf. *ante*, at 17, but because they discriminate anew each time they issue, see *Bazemore*, 478 U. S., at 395–396, and n. 6; *Morgan*, 536 U. S., at 111–112.

Subsequently, in *Morgan*, we set apart, for purposes of Title VII's timely filing requirement, unlawful employment actions of two kinds: "discrete acts" that are "easy to identify" as discriminatory, and acts that recur and are cumulative in impact. See *id.,* at 110, 113–115. "[A] [d]iscrete ac[t] such as termination, failure to promote, denial of transfer, or refusal to hire," *id.*, at 114, we explained, "'occur[s]' on the day that it 'happen[s].' A party, therefore, must file a charge within . . . 180 . . . days of the date of the act or lose the ability to recover for it." *Id.*, at 110; see *id.*, at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleg-

ing that act.").

"[D]ifferent in kind from discrete acts," we made clear, are "claims . . . based on the cumulative effect of individual acts." *Id.*, at 115. The *Morgan* decision placed hostile work environment claims in that category. "Their very nature involves repeated conduct." *Ibid.* "The unlawful employment practice" in hostile work environment claims, "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Ibid.* (internal quotation marks omitted). The persistence of the discriminatory conduct both indicates that management should have known of its existence and produces a cognizable harm. *Ibid.* Because the very nature of the hostile work environment claim involves repeated conduct,

> "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*, at 117.

Consequently, although the unlawful conduct began in the past, "a charge may be filed at a later date and still encompass the whole." *Ibid.*

Pay disparities, of the kind Ledbetter experienced, have a closer kinship to hostile work environment claims than to charges of a single episode of discrimination. Ledbetter's claim, resembling Morgan's, rested not on one particular paycheck, but on "the cumulative effect of individual acts." See *id.*, at 115. See also Brief for Petitioner 13, 15–17, and n. 9 (analogizing Ledbetter's claim to the recurring and cumulative harm at issue in *Morgan*); Reply Brief for Petitioner 13 (distinguishing pay discrimination

from "easy to identify" discrete acts (internal quotation marks omitted)). She charged insidious discrimination building up slowly but steadily. See Brief for Petitioner 5–8. Initially in line with the salaries of men performing substantially the same work, Ledbetter's salary fell 15 to 40 percent behind her male counterparts only after successive evaluations and percentage-based pay adjustments. See *supra*, at 1–2. Over time, she alleged and proved, the repetition of pay decisions undervaluing her work gave rise to the current discrimination of which she complained. Though component acts fell outside the charge-filing period, with each new paycheck, Goodyear contributed incrementally to the accumulating harm. See *Morgan*, 536 U. S., at 117; *Bazemore*, 478 U. S., at 395–396; cf. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 502, n. 15 (1968).[2]

## B

The realities of the workplace reveal why the discrimination with respect to compensation that Ledbetter suffered does not fit within the category of singular discrete acts "easy to identify." A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext. Compensation disparities, in contrast, are often hidden from sight.

---

[2] *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 117 (2002), the Court emphasizes, required that "an act contributing to the claim occu[r] within the [charge-]filing period." *Ante*, at 19, and n. 7 (emphasis deleted; internal quotation marks omitted). Here, each paycheck within the filing period compounded the discrimination Ledbetter encountered, and thus contributed to the "actionable wrong," *i.e.*, the succession of acts composing the pattern of discriminatory pay, of which she complained.

It is not unusual, decisions in point illustrate, for management to decline to publish employee pay levels, or for employees to keep private their own salaries.  See, *e.g.*, *Goodwin* v. *General Motors Corp.*, 275 F. 3d 1005, 1008–1009 (CA10 2002) (plaintiff did not know what her colleagues earned until a printout listing of salaries appeared on her desk, seven years after her starting salary was set lower than her co-workers' salaries); *McMillan* v. *Massachusetts Soc. for the Prevention of Cruelty to Animals*, 140 F. 3d 288, 296 (CA1 1998) (plaintiff worked for employer for years before learning of salary disparity published in a newspaper).[3]  Tellingly, as the record in this case bears out, Goodyear kept salaries confidential; employees had only limited access to information regarding their colleagues' earnings.  App. 56–57, 89.

The problem of concealed pay discrimination is particularly acute where the disparity arises not because the female employee is flatly denied a raise but because male counterparts are given larger raises.  Having received a pay increase, the female employee is unlikely to discern at once that she has experienced an adverse employment decision.  She may have little reason even to suspect discrimination until a pattern develops incrementally and she ultimately becomes aware of the disparity.  Even if an employee suspects that the reason for a comparatively low raise is not performance but sex (or another protected ground), the amount involved may seem too small, or the employer's intent too ambiguous, to make the issue immediately actionable—or winnable.

Further separating pay claims from the discrete em-

_____

[3] See also Bierman & Gely, "Love, Sex and Politics? Sure. Salary? No Way": Workplace Social Norms and the Law, 25 Berkeley J. Emp. & Lab. L. 167, 168, 171 (2004) (one-third of private sector employers have adopted specific rules prohibiting employees from discussing their wages with co-workers; only one in ten employers has adopted a pay openness policy).

ployment actions identified in *Morgan*, an employer gains from sex-based pay disparities in a way it does not from a discriminatory denial of promotion, hiring, or transfer. When a male employee is selected over a female for a higher level position, someone still gets the promotion and is paid a higher salary; the employer is not enriched. But when a woman is paid less than a similarly situated man, the employer reduces its costs each time the pay differential is implemented. Furthermore, decisions on promotions, like decisions installing seniority systems, often implicate the interests of third-party employees in a way that pay differentials do not. Cf. *Teamsters* v. *United States*, 431 U. S. 324, 352–353 (1977) (recognizing that seniority systems involve "vested . . . rights of employees" and concluding that Title VII was not intended to "destroy or water down" those rights). Disparate pay, by contrast, can be remedied at any time solely at the expense of the employer who acts in a discriminatory fashion.

## C

In light of the significant differences between pay disparities and discrete employment decisions of the type identified in *Morgan*, the cases on which the Court relies hold no sway. See *ante*, at 5–10 (discussing *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977), *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980), and *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989)). *Evans* and *Ricks* both involved a single, immediately identifiable act of discrimination: in *Evans*, a constructive discharge, 431 U. S., at 554; in *Ricks*, a denial of tenure, 449 U. S., at 252. In each case, the employee filed charges well after the discrete discriminatory act occurred: When United Airlines forced Evans to resign because of its policy barring married female flight attendants, she filed no charge; only four years later, when Evans was rehired, did she allege that the airline's former no-marriage rule was

unlawful and therefore should not operate to deny her seniority credit for her prior service. See *Evans*, 431 U. S., at 554–557. Similarly, when Delaware State College denied Ricks tenure, he did not object until his terminal contract came to an end, one year later. *Ricks*, 449 U. S., at 253–254, 257–258. No repetitive, cumulative discriminatory employment practice was at issue in either case. See *Evans*, 431 U. S., at 557–558; *Ricks*, 449 U. S., at 258.[4]

*Lorance* is also inapposite, for, in this Court's view, it too involved a one-time discrete act: the adoption of a new seniority system that "had its genesis in sex discrimination." See 490 U. S., at 902, 905 (internal quotation marks omitted). The Court's extensive reliance on *Lorance*, *ante*, at 7–9, 14, 17–18, moreover, is perplexing for that decision is no longer effective: In the 1991 Civil Rights Act, Congress superseded *Lorance*'s holding. §112, 105 Stat. 1079 (codified as amended at 42 U. S. C. §2000e–5(e)(2)). Repudiating our judgment that a facially neutral seniority system adopted with discriminatory intent must be challenged immediately, Congress provided:

> "For purposes of this section, an unlawful employment practice occurs . . . when the seniority system is adopted, when an individual becomes subject to the

---

[4] The Court also relies on *Machinists* v. *NLRB*, 362 U. S. 411 (1960), which like *Evans* and *Ricks*, concerned a discrete act: the execution of a collective bargaining agreement containing a union security clause. 362 U. S., at 412, 417. In *Machinists*, it was undisputed that under the National Labor Relations Act (NLRA), a union and an employer may not agree to a union security clause "if at the time of original execution the union does not represent a majority of the employees in the [bargaining] unit." *Id.,* at 412–414, 417. The complainants, however, failed to file a charge within the NLRA's six-month charge filing period; instead, they filed charges 10 and 12 months after the execution of the agreement, objecting to its subsequent enforcement. See *id.*, at 412, 414. Thus, as in *Evans* and *Ricks*, but in contrast to Ledbetter's case, the employment decision at issue was easily identifiable and occurred on a single day.

seniority system, or when a person aggrieved is in-
jured by the application of the seniority system or
provision of the system." *Ibid.*

Congress thus agreed with the dissenters in *Lorance* that
"the harsh reality of [that] decision," was "glaringly at
odds with the purposes of Title VII." 490 U. S., at 914
(opinion of Marshall, J.). See also §3, 105 Stat. 1071 (1991
Civil Rights Act was designed "to respond to recent deci-
sions of the Supreme Court by expanding the scope of
relevant civil rights statutes in order to provide adequate
protection to victims of discrimination").

　True, §112 of the 1991 Civil Rights Act directly ad-
dressed only seniority systems. See *ante*, at 8, and n. 2.
But Congress made clear (1) its view that this Court had
unduly *contracted* the scope of protection afforded by Title
VII and other civil rights statutes, and (2) its aim to gen-
eralize the ruling in *Bazemore*. As the Senate Report
accompanying the proposed Civil Rights Act of 1990, the
precursor to the 1991 Act, explained:

> "Where, as was alleged in *Lorance*, an employer
> adopts a rule or decision with an unlawful discrimina-
> tory motive, each application of that rule or decision is
> a new violation of the law. In *Bazemore* . . ., for ex-
> ample, . . . the Supreme Court properly held that each
> application of th[e] racially motivated salary struc-
> ture, *i.e.*, each new paycheck, constituted a distinct
> violation of Title VII. Section 7(a)(2) generalizes the
> result correctly reached in *Bazemore*." Civil Rights
> Act of 1990, S. Rep. No. 101–315, p. 54 (1990).[5]

See also 137 Cong. Rec. 29046, 29047 (1991) (Sponsors'
Interpretative Memorandum) ("This legislation should be
interpreted as disapproving the extension of *[Lorance]* to

---

[5] No Senate Report was submitted with the Civil Rights Act of 1991,
which was in all material respects identical to the proposed 1990 Act.

contexts outside of seniority systems."). But cf. *ante*, at 18 (relying on *Lorance* to conclude that "when an employer issues paychecks pursuant to a system that is facially nondiscriminatory and neutrally applied" a new Title VII violation does not occur (internal quotation marks omitted)).

Until today, in the more than 15 years since Congress amended Title VII, the Court had not once relied upon *Lorance*. It is mistaken to do so now. Just as Congress' "goals in enacting Title VII . . . never included conferring absolute immunity on discriminatorily adopted seniority systems that survive their first [180] days," 490 U. S., at 914 (Marshall, J., dissenting), Congress never intended to immunize forever discriminatory pay differentials unchallenged within 180 days of their adoption. This assessment gains weight when one comprehends that even a relatively minor pay disparity will expand exponentially over an employee's working life if raises are set as a percentage of prior pay.

A clue to congressional intent can be found in Title VII's backpay provision. The statute expressly provides that backpay may be awarded for a period of up to two years before the discrimination charge is filed. 42 U. S. C. §2000e–5(g)(1) ("Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission."). This prescription indicates that Congress contemplated challenges to pay discrimination commencing before, but continuing into, the 180-day filing period. See *Morgan*, 536 U. S., at 119 ("If Congress intended to limit liability to conduct occurring in the period within which the party must file the charge, it seems unlikely that Congress would have allowed recovery for two years of backpay."). As we recognized in *Morgan*, "the fact that Congress expressly limited the amount of recoverable damages elsewhere to a particular time period [*i.e.*, two years] indicates that the [180-day] timely filing provi-

sion was not meant to serve as a specific limitation . . . [on] the conduct that may be considered." *Ibid.*

## D

In tune with the realities of wage discrimination, the Courts of Appeals have overwhelmingly judged as a present violation the payment of wages infected by discrimination: Each paycheck less than the amount payable had the employer adhered to a nondiscriminatory compensation regime, courts have held, constitutes a cognizable harm. See, *e.g.*, *Forsyth* v. *Federation Employment and Guidance Serv.*, 409 F. 3d 565, 573 (CA2 2005) ("Any paycheck given within the [charge-filing] period . . . would be actionable, even if based on a discriminatory pay scale set up outside of the statutory period."); *Shea* v. *Rice*, 409 F. 3d 448, 452–453 (CADC 2005) ("[An] employer commit[s] a separate unlawful employment practice each time he pa[ys] one employee less than another for a discriminatory reason" (citing *Bazemore*, 478 U. S., at 396)); *Goodwin* v. *General Motors Corp.*, 275 F. 3d 1005, 1009–1010 (CA10 2002) ("*[Bazemore]* has taught a crucial distinction with respect to discriminatory disparities in pay, establishing that a discriminatory salary is not merely a lingering effect of past discrimination—instead it is itself a continually recurring violation. . . . [E]ach race-based discriminatory salary payment constitutes a fresh violation of Title VII." (footnote omitted)); *Anderson* v. *Zubieta*, 180 F. 3d 329, 335 (CADC 1999) ("The Courts of Appeals have repeatedly reached the . . . conclusion" that pay discrimination is "actionable upon receipt of each paycheck."); accord *Hildebrandt* v. *Illinois Dept. of Natural Resources*, 347 F. 3d 1014, 1025–1029 (CA7 2003); *Cardenas* v. *Massey*, 269 F. 3d 251, 257 (CA3 2001); *Ashley* v. *Boyle's Famous Corned Beef Co.*, 66 F. 3d 164, 167–168 (CA8 1995) (en banc); *Brinkley-Obu* v. *Hughes Training, Inc.*, 36 F. 3d 336, 347–349 (CA4 1994); *Gibbs* v. *Pierce County Law*

*Enforcement Support Agency*, 785 F. 2d 1396, 1399–1400 (CA9 1986).

Similarly in line with the real-world characteristics of pay discrimination, the EEOC—the federal agency responsible for enforcing Title VII, see, *e.g.*, 42 U. S. C. §§2000e–5(f), 2000e–12(a)—has interpreted the Act to permit employees to challenge disparate pay each time it is received. The EEOC's Compliance Manual provides that "repeated occurrences of the same discriminatory employment action, such as discriminatory paychecks, can be challenged as long as one discriminatory act occurred within the charge filing period." 2 EEOC Compliance Manual §2–IV–C(1)(a), p. 605:0024, and n. 183 (2006); cf. *id.*, §10–III, p. 633:0002 (Title VII requires an employer to eliminate pay disparities attributable to a discriminatory system, even if that system has been discontinued).

The EEOC has given effect to its interpretation in a series of administrative decisions. See *Albritton* v. *Potter*, No. 01A44063, 2004 WL 2983682, *2 (EEOC Office of Fed. Operations, Dec. 17, 2004) (although disparity arose and employee became aware of the disparity outside the charge-filing period, claim was not time barred because "[e]ach paycheck that complainant receives which is less than that of similarly situated employees outside of her protected classes could support a claim under Title VII if discrimination is found to be the reason for the pay discrepancy." (citing *Bazemore*, 478 U. S., at 396)). See also *Bynum-Doles* v. *Winter*, No. 01A53973, 2006 WL 2096290 (EEOC Office of Fed. Operations, July 18, 2006); *Ward* v. *Potter*, No. 01A60047, 2006 WL 721992 (EEOC Office of Fed. Operations, Mar. 10, 2006). And in this very case, the EEOC urged the Eleventh Circuit to recognize that Ledbetter's failure to challenge any particular pay-setting decision when that decision was made "does not deprive her of the right to seek relief for discriminatory paychecks she received in 1997 and 1998." Brief of EEOC in Support

of Petition for Rehearing and Suggestion for Rehearing En Banc, in No. 03–15264–GG (CA11), p. 14 (hereinafter EEOC Brief) (citing *Morgan*, 536 U. S., at 113).[6]

## II

The Court asserts that treating pay discrimination as a discrete act, limited to each particular pay-setting decision, is necessary to "protec[t] employers from the burden of defending claims arising from employment decisions that are long past." *Ante*, at 11 (quoting *Ricks*, 449 U. S., at 256–257). But the discrimination of which Ledbetter complained is *not* long past. As she alleged, and as the jury found, Goodyear continued to treat Ledbetter differently because of sex each pay period, with mounting harm. Allowing employees to challenge discrimination "that extend[s] over long periods of time," into the charge-filing period, we have previously explained, "does not leave employers defenseless" against unreasonable or prejudicial delay. *Morgan*, 536 U. S., at 121. Employers disadvantaged by such delay may raise various defenses. *Id.*, at 122. Doctrines such as "waiver, estoppel, and equitable tolling" "allow us to honor Title VII's remedial purpose without negating the particular purpose of the filing requirement, to give prompt notice to the employer." *Id.*, at 121 (quoting *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 398 (1982)); see 536 U. S., at 121 (defense of laches may be invoked to block an employee's suit "if he unrea-

_____

[6]The Court dismisses the EEOC's considerable "experience and informed judgment," *Firefighters* v. *Cleveland*, 478 U. S. 501, 518 (1986) (internal quotation marks omitted), as unworthy of any deference in this case, see *ante*, at 23–24, n. 11. But the EEOC's interpretations mirror workplace realities and merit at least respectful attention. In any event, the level of deference due the EEOC here is an academic question, for the agency's conclusion that Ledbetter's claim is not time barred is the best reading of the statute even if the Court "were interpreting [Title VII] from scratch." See *Edelman* v. *Lynchburg College*, 535 U. S. 106, 114 (2002); see *supra*, at 4–14.

sonably delays in filing [charges] and as a result harms the defendant"); EEOC Brief 15 ("[I]f Ledbetter unreasonably delayed challenging an earlier decision, and that delay significantly impaired Goodyear's ability to defend itself . . . Goodyear can raise a defense of laches. . . .").[7]

In a last-ditch argument, the Court asserts that this dissent would allow a plaintiff to sue on a single decision made 20 years ago "even if the employee had full knowledge of all the circumstances relating to the . . . decision at the time it was made." *Ante*, at 20. It suffices to point out that the defenses just noted would make such a suit foolhardy. No sensible judge would tolerate such inexcusable neglect. See *Morgan*, 536 U. S., at 121 ("In such cases, the federal courts have the discretionary power . . . to locate a just result in light of the circumstances peculiar to the case." (internal quotation marks omitted)).

Ledbetter, the Court observes, *ante*, at 21, n. 9, dropped an alternative remedy she could have pursued: Had she persisted in pressing her claim under the Equal Pay Act of 1963 (EPA), 29 U. S. C. §206(d), she would not have encountered a time bar.[8] See *ante*, at 21 ("If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts."); cf. *Corning Glass Works* v. *Brennan*, 417 U. S. 188, 208–210 (1974). Nota-

-------

[7] Further, as the EEOC appropriately recognized in its brief to the Eleventh Circuit, Ledbetter's failure to challenge particular pay raises within the charge-filing period "significantly limit[s] the relief she can seek. By waiting to file a charge, Ledbetter lost her opportunity to seek relief for any discriminatory paychecks she received between 1979 and late 1997." EEOC Brief 14. See also *supra*, at 12–13.

[8] Under the EPA 29 U. S. C. §206(d), which is subject to the Fair Labor Standards Act's time prescriptions, a claim charging denial of equal pay accrues anew with each paycheck. 1 B. Lindemann & P. Grossman, Employment Discrimination Law 529 (3d ed. 1996); cf. 29 U. S. C. §255(a) (prescribing a two-year statute of limitations for violations generally, but a three-year limitation period for willful violations).

bly, the EPA provides no relief when the pay discrimination charged is based on race, religion, national origin, age, or disability. Thus, in truncating the Title VII rule this Court announced in *Bazemore*, the Court does not disarm female workers from achieving redress for unequal pay, but it does impede racial and other minorities from gaining similar relief.[9]

Furthermore, the difference between the EPA's prohibition against paying unequal wages and Title VII's ban on discrimination with regard to compensation is not as large as the Court's opinion might suggest. See *ante*, at 21. The key distinction is that Title VII requires a showing of intent. In practical effect, "if the trier of fact is in equipoise about whether the wage differential is motivated by gender discrimination," Title VII compels a verdict for the employer, while the EPA compels a verdict for the plaintiff. 2 C. Sullivan, M. Zimmer, & R. White, Employment Discrimination: Law and Practice §7.08[F][3], p. 532 (3d ed. 2002). In this case, Ledbetter carried the burden of persuading the jury that the pay disparity she suffered was attributable to intentional sex discrimination. See *supra*, at 1–2; *infra*, this page and 18.

## III

To show how far the Court has strayed from interpretation of Title VII with fidelity to the Act's core purpose, I return to the evidence Ledbetter presented at trial. Ledbetter proved to the jury the following: She was a member of a protected class; she performed work substan-

_____

[9] For example, under today's decision, if a black supervisor initially received the same salary as his white colleagues, but annually received smaller raises, there would be no right to sue under Title VII outside the 180-day window following each annual salary change, however strong the cumulative evidence of discrimination might be. The Court would thus force plaintiffs, in many cases, to sue too soon to prevail, while cutting them off as time barred once the pay differential is large enough to enable them to mount a winnable case.

tially equal to work of the dominant class (men); she was compensated less for that work; and the disparity was attributable to gender-based discrimination. See *supra*, at 1–2.

Specifically, Ledbetter's evidence demonstrated that her current pay was discriminatorily low due to a long series of decisions reflecting Goodyear's pervasive discrimination against women managers in general and Ledbetter in particular. Ledbetter's former supervisor, for example, admitted to the jury that Ledbetter's pay, during a particular one-year period, fell below Goodyear's minimum threshold for her position. App. 93–97. Although Goodyear claimed the pay disparity was due to poor performance, the supervisor acknowledged that Ledbetter received a "Top Performance Award" in 1996. *Id.,* at 90–93. The jury also heard testimony that another supervisor—who evaluated Ledbetter in 1997 and whose evaluation led to her most recent raise denial—was openly biased against women. *Id.,* at 46, 77–82. And two women who had previously worked as managers at the plant told the jury they had been subject to pervasive discrimination and were paid less than their male counterparts. One was paid less than the men she supervised. *Id.,* at 51–68. Ledbetter herself testified about the discriminatory animus conveyed to her by plant officials. Toward the end of her career, for instance, the plant manager told Ledbetter that the "plant did not need women, that [women] didn't help it, [and] caused problems." *Id.,* at 36.[10] After weighing all the evidence, the jury found for Ledbetter, concluding that the pay disparity was due to intentional discrimination.

Yet, under the Court's decision, the discrimination Ledbetter proved is not redressable under Title VII. Each

_____

[10] Given this abundant evidence, the Court cannot tenably maintain that Ledbetter's case "turned principally on the misconduct of a single Goodyear supervisor." See *ante,* at 12–13, n. 4.

and every pay decision she did not immediately challenge wiped the slate clean. Consideration may not be given to the cumulative effect of a series of decisions that, together, set her pay well below that of every male area manager. Knowingly carrying past pay discrimination forward must be treated as lawful conduct. Ledbetter may not be compensated for the lower pay she was in fact receiving when she complained to the EEOC. Nor, were she still employed by Goodyear, could she gain, on the proof she presented at trial, injunctive relief requiring, prospectively, her receipt of the same compensation men receive for substantially similar work. The Court's approbation of these consequences is totally at odds with the robust protection against workplace discrimination Congress intended Title VII to secure. See, *e.g.*, *Teamsters* v. *United States*, 431 U. S., at 348 ("The primary purpose of Title VII was to assure equality of employment opportunities and to eliminate . . . discriminatory practices and devices . . . ." (internal quotation marks omitted)); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 418 (1975) ("It is . . . the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination.").

This is not the first time the Court has ordered a cramped interpretation of Title VII, incompatible with the statute's broad remedial purpose. See *supra*, at 10–12. See also *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642 (1989) (superseded in part by the Civil Rights Act of 1991); *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989) (plurality opinion) (same); 1 B. Lindemann & P. Grossman, Employment Discrimination Law 2 (3d ed. 1996) ("A spate of Court decisions in the late 1980s drew congressional fire and resulted in demands for legislative change[,]" culminating in the 1991 Civil Rights Act (footnote omitted)). Once again, the ball is in Congress' court. As in 1991, the Legislature may act to correct this Court's parsimonious reading of Title VII.

\*     \*     \*

For the reasons stated, I would hold that Ledbetter's claim is not time barred and would reverse the Eleventh Circuit's judgment.